No. 77,848

ALBERT ADAMS and FORESTEAN ADAMS, Individually, and as Special Administrators of the Estate of NICHELLE DENISE ADAMS, deceased, *Appellants*, v. ST. FRANCIS REGIONAL MEDICAL CENTER and LINUS OHAEBOSIM, *Appellees.*
(955 P.2d 1169)

Opinion filed March 6, 1998.

*Randall E. Fisher*, of Law Offices of Randall E. Fisher, of Wichita, argued the cause and was on the briefs for appellants, and *Lynn R. Johnson*, of Shamberg, Johnson & Bergman, Chartered, of Overland Park, argued the cause for appellants.

*Don D. Gribble II*, of Kahrs, Nelson, Fanning, Hite & Kellogg, L.L.P., of Wichita, argued the cause, and *Donald N. Peterson II*, of the same firm, was with him on the brief for appellees.

*Wayne T. Stratton, Charles R. Hay*, and *Marta Fisher Linenberger*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, were on the brief for *amici curiae* Kansas Hospital Association and Kansas Medical Society.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Albert and Forestean Adams allege that their daughter suffered injury and died due to negligent treatment by Dr. Linus Ohaebosim and St. Francis Regional Medical Center, a/k/a Via Christi Hospital (St. Francis). They took this interlocutory appeal from the district court's decision that documents gathered and produced by the State Board of Nursing (Board) in connection with its investigation of Adams' death were protected by statutory privileges. The district court certified its rulings for interlocutory appeal pursuant to K.S.A. 60-2102(b). Appellants' request for leave to file the appeal was granted in December 1996. This court transferred the case from the Court of Appeals pursuant to K.S.A. 20-3018(c).

The following two issues are raised in this interlocutory appeal:

1. Are documents gathered and produced by the Board in connection with its investigation of the death of Nichelle Adams protected by statutory privileges?

2. Are the statutes that create health care privileges unconstitutional as applied in this case?

Nichelle Adams, the daughter of appellants Albert and Forestean Adams, died as a result of a ruptured ectopic pregnancy in July 1992. The Adamses allege that the emergency room nurse, Ann Locke, who initially assessed their daughter's condition, did not recognize its seriousness and did not alert a physician to Adams' need for immediate attention.

In the district court, St. Francis filed two motions for protective orders, the first in May 1995 and the second in July 1995. Both were granted. Appellants filed a motion to determine the constitutionality of the privilege statutes. It was denied.

St. Francis' first motion sought a protective order limiting use of documents obtained by plaintiffs' counsel from the Board relative to the Board's investigation of Ann Locke. The Board is not a party to this lawsuit. The following statement was made by St. Francis in explaining why it filed the first motion for a protective order:

"The Kansas State Board of Nursing investigated Ms. Locke's conduct concerning the events of July 23, 1992. The Board obtained various documents from St. Francis, including Disciplinary Action Forms on Ms. Locke. The Board also interviewed St. Francis personnel concerning Ms. Locke.

"During the litigation of this matter, plaintiffs' counsel subpoenaed the Board's investigation file on Ms. Locke. The Board produced to plaintiffs' counsel what appears to be the entire investigation file, including the Disciplinary Action Forms from St. Francis, typed summaries of interviews of St. Francis employees and the Board's investigative Summary. Plaintiffs' counsel has revealed that, when the Board produced the file, it did not in any way protect the confidentiality of the subject or sources of the information. Plaintiffs' counsel is now using the records as a cross-examination tool in depositions of St. Francis employees, directing specific inquiry to what employees may have stated to the Board concerning prior conduct of Ms. Locke. The St. Francis Disciplinary Action Forms are being used for this purpose, as well."

St. Francis contended that the Board is required by statute, K.S.A. 1997 Supp. 65-1135(a), to maintain confidential records, that the Board breached the confidentiality requirement, and that the disciplinary action forms were prepared in conjunction with peer review and are protected by K.S.A. 1997 Supp. 65-4915(3)(D) and (I). St. Francis asserted: "The Board, by producing these forms to plaintiffs' counsel, should not be allowed to unilaterally waive St. Francis' privilege with regard to the forms being protected by the peer review statute." The pertinent part of the prayer in St. Francis' first motion states: "St. Francis prays the Court enter a protective order preventing counsel's use of Kansas State Board of Nursing documentation."

The district court heard argument on St. Francis' first motion on June 14, 1995. It granted the motion. During argument, plaintiffs' counsel repeatedly stated that it would be unconstitutional for the court to grant protection to the Board's documents. The district court refused to rule on a question of constitutionality because it had not been briefed.

In July 1995, St. Francis filed another motion for protective order, alleging that plaintiffs' counsel was attempting to circumvent the protective order granted by the district court the previous month by deposing people with knowledge of the contents of the protected documents. St. Francis asked the court to enter another protective order and to quash depositions and notices sent by plaintiffs' counsel.

In August 1995, plaintiffs filed a motion to determine the constitutionality of the health care privilege statutes invoked by St. Francis. They prayed that the district court would "declare the various privilege statutes, such as risk-management and peer-review cited in oral arguments, unconstitutional[,] deny defendant's motion to obtain a protective order[,] and rule that plaintiff's evidence of previous acts of negligence and similar misconduct be admitted at trial." St. Francis contended that plaintiffs' knowledge of "previous acts of negligence and similar misconduct" of Ann Locke had been gleaned from the now-protected Board documents.

The record on appeal does not seem to contain any indication that the plaintiffs' motion was ruled on before October 1996, when a ruling on it was included in the order certifying issues for interlocutory appeal. The record on appeal contains only an oblique reference to a ruling on St. Francis' second motion. The reference was made during a hearing on still another pretrial motion.

In September 1995, plaintiffs requested leave to amend their petition to add a claim for punitive damages. The record contains a transcript of a hearing on the motion to amend. Plaintiffs' counsel stated to the district court that the claim for punitive damages was built on information in the Board documents. In this regard, plaintiffs' counsel stated:

"So I'm stuck in a position of trying to present to the Court a punitive damage claim by way of this motion so I can amend. But separately having to deal with the issue of whether or not I'm going to get it in at trial. And under Judge Corrigan's current ruling, I'm not going to.

"But the question is I intend to take that up and have it reviewed by either the Supreme Court or the Court of Appeals, and I feel like I have an obligation to present the issue to this Court whether or not this evidence would get me past the amendment, to allow me to proceed."

He explained to the district court that he and St. Francis' counsel disagreed about the scope and substance of the ruling on St. Francis' motion for protective order:

"I don't have any significant disagreement with [St. Francis' counsel] when he says that Judge Corrigan had entered an order. It's not been journalized at this point. So I'm not sure exactly what the copy would be, because we're still haggling over the Journal Entry, and we're going to be working on that."

St. Francis' counsel told the court that the unjournalized ruling was on the second motion for protective order. St. Francis' counsel represented that "the Court ruled [plaintiffs' counsel] could not depose the persons, among others, . . . connected with the Kansas State Board of Nursing, relative to these documents." He continued, "Judge Corrigan talked about certifying that matter for interlocutory appeal, so we have not seen the last of this or heard the final word on it."

As the hearing drew to a close, the district judge concluded that plaintiffs' motion for leave to amend their petition should be denied:

"[M]otions such as this are governed by K.S.A. 60-3703. Those statutes basically provide . . . that the initial question . . . is whether the plaintiff has established that there is a probability by clear and convincing evidence that the plaintiff will prevail on the claim.

"The quandary this Court is in is that another district judge has ruled upon the admissibility of various items, information which has been sustained by plaintiff. Judge Corrigan ruled, based upon what both counsel advised me, that the material obtained from the State Board of Nursing was confidential and privileged information.

"I cannot overrule Judge Corrigan. . . . I feel that the evidence that would be available for trial at this point in time, based upon everything I have observed in the plaintiffs' motion, would not . . . show that the plaintiffs would prevail on a claim at the time of trial."

The district judge continued: "I will state, although I think it is meaningless, that if the items and information from the State Board of Nursing were admissible, there would be sufficient grounds [for granting leave to amend]." Thus, the court denied plaintiffs leave to add a claim for punitive damages.

For reasons not apparent from the record, the matter lay dormant until October 1996, when another district judge signed the order that stated rulings on St. Francis' two motions and plaintiffs' motion challenging the constitutionality of the privilege statutes, incorporated findings and conclusions from the June 14, 1995, hearing, and certified the rulings for appeal. Exhibit B to the district court order is identified as "documents obtained from the Kansas State Board of Nursing relative to the Board's investigation of Ann Locke, RN."

The certified rulings are as follows:

1. St. Francis' motion for a protective order "regarding the records of Ann Locke, RN, in the possession of the Kansas State Board of Nursing" is granted. "Those records may not be used for any further purpose by plaintiffs in this case."

2. St. Francis' motion for a protective order and an order quashing the depositions of Patsy Johnson, Harry Holloway, Diane Glynn, and others is granted.

3. The district court expressly found that the witnesses, documents and information "sought by plaintiffs in Exhibits B and C [Business Records Subpoena and St. Francis' second motion for protective order] are protected by K.S.A. 65-1135, 65-4915, 65-4922, 65-4923 and 65-4925."

4. The district court expressly found that the statutes identified in No. 3 are constitutional.

As a preliminary matter, we need to dispose of the appellees' motion to dismiss this appeal. St. Francis filed a motion to dismiss the appeal for lack of jurisdiction on the ground that the notice of appeal was not timely filed in the district court. Appellants filed suggestions in opposition to the motion. On February 21, 1997, the Court of Appeals ordered that the motion would be considered by the hearing panel. In July, this court transferred the case from

the Court of Appeals with appellees' motion to dismiss still pending.

The procedure for an interlocutory appeal in a civil case is established by statute and rule. K.S.A. 60-2102(b) provides, in part:

"When a district judge, in making in a civil action an order not otherwise appealable under this section, is of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, the judge shall so state in writing in such order. The court of appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within 10 days after the entry of the order under such terms and conditions as the supreme court fixes by rule."

Supreme Court Rule 4.01 (1997 Kan. Ct. R. Annot. 26) provides, in part:

"If permission to appeal is granted, the notice of appeal shall be filed in the district court within the time fixed by K.S.A. 60-2103, for taking an appeal or within ten (10) days after permission to appeal is granted, whichever is later. Within ten (10) days after such filing, a certified copy of the notice of appeal, a copy of any request for transcript or statement that no transcript will be requested, and an original and one copy of the docketing statement required by Rule 2.041 shall be filed with the clerk of the appellate courts. The appeal shall thereupon be deemed docketed."

K.S.A. 60-2103 provides, in part:

"When an appeal is permitted by law from a district court to an appellate court, the time within which an appeal may be taken shall be 30 days from the entry of the judgment . . . .

"A party may appeal from a judgment by filing with the clerk of the district court a notice of appeal."

St. Francis' argument is that when the Court of Appeals granted permission for appellants to appeal, more than 30 days had elapsed from the entry of the district court's order from which the appeal was being taken. Thus, 10 days from the date permission to appeal was granted was the controlling deadline for filing the notice of appeal in the district court. Permission was granted on December 10, 1996; notice of appeal was filed in the district court on January 3, 1997. Therefore, according to St. Francis, the notice of appeal was untimely. St. Francis concludes: "Where a party fails to timely

file a notice of appeal as required by statute, this Court lacks jurisdiction to consider the appeal."

Appellants advocate interpreting Rule 4.01 to give 30 days after permission to appeal is granted in regular civil actions and 10 days in other cases—probation and juvenile matters, for instance. In this way, the appellate court's granting permission to appeal would be treated as the appealable order. This argument defies logic and has no merit.

We agree with appellees that the notice of appeal was untimely. We do not agree that this court lacks jurisdiction to consider the appeal. There is no statutorily set period of time in which the notice of appeal must be filed in the district court in an interlocutory appeal. The 10-day period is established by rule of this court and, hence, is not jurisdictional. K.S.A. 60-2103 establishes a 30-day period from the entry of a final judgment and applies only to an interlocutory appeal by virtue of its incorporation in this court's Rule 4.01. As discussed in *Jones v. Continental Can Co.*, 260 Kan. 547, 558, 920 P.2d 939 (1996), we would violate the separation of powers doctrine if we were to expand a clearly stated statutory period within which an appeal must be filed by the use of procedural rules. Here, since there is no clearly stated statutory period within which notice of appeal must be filed, we are under no comparable constraint. Thus, it is within the court's discretion to consider this appeal.

The purpose of an interlocutory appeal is to resolve a "controlling question of law" that would materially expedite a final determination in the case. Failure to resolve the issues raised in this appeal would cause further delay and not benefit the parties or serve any useful purpose. Justice would not be served if we refused to address the issues at this time. The motion to dismiss the appeal is denied.

We first consider whether the documents at issue are protected by statute. The "Protective Order and Order Granting Other Discovery Relief" filed by the district court on October 21, 1996, indicates that the documents obtained by plaintiffs' counsel from the Board are designated in the record as Exhibit B to the order. Examination of Exhibit B reveals that there are two categories of

contested documents—those generated by the hospital and those generated by the Board. The Board's documents are:

1. Board's Investigative Summary, which is signed by Harry Holloway, Investigator, and dated June 9, 1993. The source of the report that seems to have alerted the Board to the incident has been blacked out.

2. Handwritten notes and typewritten summaries of interviews of Debbie Springer and Pat Howell. Howell is identified as Locke's supervisor at St. Francis. Springer is apparently a nurse employed at St. Francis.

3. A second document titled "Investigative Summary." It is not signed, it is dated October 27, 1992, and it is quite a bit less detailed than the later summary. The last paragraph states:

"On October 21, 1992, I travelled to Wichita, Kansas and met with Mary McHugh, Director of Nursing Services at St. Francis and issued a Subpoena for the complete patient records on this incident and copies of the Disciplinary action forms and Risk Management/Q.A. minutes concerning this incident. This information was delivered to me along with an affidavit verifying the information to be true and accurate copies."

The hospital's documents are:

4. A form titled "Disciplinary Action Documentation" is filled out for Ann Locke. It is signed by Department Director Kathy Conley and by Debra Springer, RN, who is identified as "witness." Both signatures are dated "8-5-92." Under "Type of Action," the box for "Termination Documentation" is marked. Locke's behavior is described as follows: "Failure to meet job standards as it pertains to an inaccurate assessment of a critical patient's condition. The inaccurate assessment resulted in a delay of further treatment which may have contributed to the patient's death."

5. A form titled "Disciplinary Action Form" is filled out for Ann Locke. It indicates that Locke was suspended for 3 days "for investigation of the [Adams] situation." It is signed by Kathy Conley and dated "7-27-92."

6. Another Disciplinary Action Form is filled out for Ann Locke. It bears an unreadable supervisor's signature and is dated "7-18-92." The identified problem is five unscheduled absences between mid-October 1991 and mid-July 1992.

7. A third Disciplinary Action Form filled out for Ann Locke. This one is signed by supervisor Patricia Howell and department director Kathy Conley, and is dated "3-24-92." The following situation is described:

"Failure to meet job standards in relation to quality, quantity, & timeliness of work. On March 5, 1992, Ann was assigned to be primary caregiver of a level II trauma pt. by BC personnel. Ann initially refused, instead wanting an inexperienced _____ [illegible]. Ann reluctantly provided primary care. Her lack of confidence in caring for critical/trauma pts & lack of initiative to seek nursing duties is a great concern."

Actions to be taken to improve her performance include: "Ann was assigned to 2 experienced RN's to share care of critical pts in effort to [increase] her comfort [with] these cases. After a 30 day period, Ann expressed she felt her level of comfort had improved. Clinical pract. does not reflect this."

8. A fourth Disciplinary Action Form filled out for Ann Locke involves attendance, specifically tardiness.

According to the parties, the statutes at issue are K.S.A. 1997 Supp. 65-1135, K.S.A. 1997 Supp. 65-4915, K.S.A. 65-4922, K.S.A. 65-4923 and K.S.A. 65-4925. K.S.A. 1997 Supp. 65-1135 was a 1993 addition to the Kansas Nurse Practice Act. It provided, in part:

"(a) Any complaint or report, record or other information relating to the investigation of a complaint about a person licensed by the board which is received, obtained or maintained by the board is confidential and shall not be disclosed by the board or its employees in a manner which identified or enables identification of the person who is the subject or source of such information . . . ."

There are some exceptions to this rule, and plaintiffs contend that the exception stated in subsection (a)(1) applies in the circumstances of the present case. It provides that records are confidential and shall not be disclosed in a manner which identifies or enables identification of the subject person or source of information except "[i]n a disciplinary proceeding conducted by the board pursuant to law or in an appeal of the order of the board entered in such proceeding, or to any party to such proceeding or appeal or such party's attorney."

In September 1994, the Board initiated disciplinary proceedings against Ann Locke. In Count I of the petition, Locke was charged with professional incompetency in failing to notify a physician of Adams' condition; in Count II, in the alternative, she was charged with unprofessional conduct for the same failing. In February 1995, the Board and Locke entered into a consent agreement that "there are reasonable grounds to believe [Locke] violated the [Kansas Nurse Practice] Act" and Locke pled no contest to Count II of the petition against her. "Pursuant to the disciplinary remedies available in K.S.A. 65-1120," Locke's license to practice as a registered professional nurse was suspended for 1 year, but the suspension was conditionally stayed so that she could continue to practice.

St. Francis treats the 65-1135(a)(1) exception as if its only significance were as a possible nexus to the Open Records Act, K.S.A. 45-215 through 45-223:

"Although K.S.A. 1996 Supp. 65-1135(a)(1) creates an exception allowing the use of confidential Nursing Board information as part of a Nursing Board 'disciplinary proceeding,' such a use by no means makes the information 'discoverable' under the Open Records Act. On the contrary, the Open Records Act specifically excludes release of such records. K.S.A. 1996 Supp. 45-221 states:

'[(a)] Except to the extent disclosure is otherwise required by law, a public agency shall not be required to disclose:

. . . .

(36) Any report or record which is made pursuant to K.S.A. 65-4922, 65-4923 or 65-4924, and amendments thereto, and which is privileged pursuant to K.S.A. 65-4915 or 65-4925, and amendments thereto.'

Plaintiffs' claim that the Open Records Act made the subject documents public is simply not supported."

In the present case, upon receiving the business records subpoena, the assistant attorney general who acts as disciplinary counsel on behalf of the Board sent plaintiffs' counsel an open records request form with the suggestion that "[m]any of the records you request are available under the Open Records Act. However, please be advised that other records and information are protected by K.S.A. 65-1135, 65-4914, 65-4915 and 65-4921 *et seq.*" Disciplinary counsel's letter is dated February 28, 1995, and his signature on the consent agreement is dated March 2, 1995. The peti-

tion by which the disciplinary proceeding was initiated against Locke was filed in September 1994.

K.S.A. 1997 Supp. 65-4915(b) provides:

"Except as provided by K.S.A. 60-437 and amendments thereto and by subsections (c) and (d), the reports, statements, memoranda, proceedings, findings and other records submitted to or generated by peer review committees or officers shall be privileged and shall not be subject to discovery, subpoena or other means of legal compulsion for their release to any person or entity or be admissible in evidence in any judicial or administrative proceeding. Information contained in such records shall not be discoverable or admissible at trial in the form of testimony by an individual who participated in the peer review process. The peer review officer or committee creating or initially receiving the record is the holder of the privilege established by this section. This privilege may be claimed by the legal entity creating the peer review committee or officer, or by the commissioner of insurance for any records or proceedings of the board of governors."

"Peer review committee" is defined as "a committee of or employed, designated or appointed by, a health care provider group and authorized to perform peer review." K.S.A. 1997 Supp. 65-4915(a)(4)(A). "Health care provider group" is defined to include a health care provider, which is defined as "[t]hose . . . entities defined as a health care provider under K.S.A. 40-3401 and amendments thereto." K.S.A. 1997 Supp. 65-4915(a)(1)(A). K.S.A. 1997 Supp. 40-3401(f) includes "a medical care facility licensed by the department of health and environment" in the definition of health care provider. K.S.A. 1997 Supp. 65-4915(e) provides:

"A peer review committee or officer may report to and discuss its activities, information and findings to other peer review committees or officers or to a board of directors or an administrative officer of a health care provider without waiver of the privilege provided by subsection (b) and the records of all such committees or officers relating to such report shall be privileged as provided by subsection (b)."

K.S.A. 65-4922 requires each medical care facility to establish and maintain an internal risk management program. Subsection (g) provides:

"Any reports and records reviewed or obtained by the department and in the department's possession, pursuant to subsection (a) of K.S.A. 65-4925, and amendments thereto, shall be confidential and privileged and not subject to discovery, subpoena or legal compulsion for their release to any person or entity, nor

shall they be admissible in any civil or administrative action other than a discipli-
nary proceeding by the department."

K.S.A. 65-4923 requires health care providers and medical care
facility agents and employees to report incidents in which the care
may have been substandard and there was a reasonable probability
of injury to a patient to appropriate authorities. K.S.A. 65-4925(a)
provides:

"The reports and records made pursuant to K.S.A. 65-4923 . . . and amend-
ments thereto, shall be confidential and privileged, including:

(1) Reports and records of executive or review committees of medical care
facilities or of a professional society or organization;

(2) reports and records of the chief of the medical staff, chief administrative
officer or risk manager of a medical care facility;

(3) reports and records of any state licensing agency or impaired provider com-
mittee of a professional society or organization; and

(4) reports made pursuant to this act to or by a medical care facility risk man-
ager, any committee, the board of directors, administrative officer or any con-
sultant.

"Such reports and records shall not be subject to discovery, subpoena or other
means of legal compulsion for their release to any person or entity and shall not
be admissible in any civil or administrative action other than a disciplinary pro-
ceeding by the appropriate state licensing agency."

The protection conferred on the documents produced by the
Board is based strictly on the statutes quoted above. Interpretation
of a statute is a question of law, and this court's review is unlimited.
*In re Tax Appeal of Boeing Co.*, 261 Kan. 508, Syl. ¶ 1, 930 P.2d
1366 (1997). In interpreting these statutes, we must necessarily
address the constitutionality of the statutes as applied in the pres-
ent case.

The rules of construction which guide us have been stated by
this court numerous times. The fundamental rule of statutory con-
struction is that the intent of the legislature governs: "In deter-
mining legislative intent, courts are not limited to a mere consid-
eration of the language used, but look to the historical background
of the enactment, the circumstances attending its passage, the pur-
pose to be accomplished, and the effect the statute may have under
the various constructions suggested." *State v. Le*, 260 Kan. 845,
Syl. ¶ 3, 926 P.2d 638 (1996).

"A statute is presumed constitutional and all doubts must be resolved in favor if its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court must do so. A statute must clearly violate the constitution before it may be struck down. This court not only has the authority, but also the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute." *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, Syl. ¶ 2, 930 P.2d 1 (1996), *cert. denied* 137 L. Ed. 2d 1029 (1997).

Plaintiffs raise a number of questions about the applicability of the statutes in this case—standing, statutory exception, overly broad interpretation of peer review activity, and overly broad interpretation of risk management activity. Plaintiffs are correct in contending that the party seeking protection bears the burden of showing its applicability to individual documents, but, now that the matter is on appeal from a protective order, the focus shifts from the process to the result. Moreover, there is nothing in the record from which this court could ascertain what the district court's process or rationale was in determining that the documents were protected. The written protective order that is in the record on appeal, which was filed October 21, 1996, seems to have been made so that there would be a contemporary written ruling to certify for appeal. The district court actually considered and ruled on St. Francis' motions seeking protection in mid-1995. Although it would seem from a comment made by defendant's counsel at an unrelated hearing that there was a written ruling on at least one of the hospital's motions for protection, it does not seem to be included in the record on appeal: "I filed a motion for protective order. The Court ruled upon that motion on June 14, 1995. The Court will find that I have provided that ruling, specifically pages 20 and 23." The rule followed by this court is that it is the responsibility of an appellant to furnish a record from which the issues may be determined. "Without an adequate record, an appellant's claim of alleged error fails." *McCubbin v. Walker*, 256 Kan. 276, 295, 886 P.2d 790 (1994).

Plaintiffs contend that St. Francis has no standing to claim that the documents in the Board's file are protected by the peer review privilege. They rely on the last sentence of 65-4915(b), which al-

lows the privilege to be claimed by the legal entity creating the peer review committee or officer. They argue that "the peer review agency is the State Board of Nursing." St. Francis argues that appellants misconstrue 65-4915(a)(4)(A) and ignore 65-4915(d). Appellants' position does not seem to have any support in the statutes. It seems to assume that a peer review can be conducted only at the level of the state Board, but we already have seen that K.S.A. 1997 Supp. 65-4915 and K.S.A. 1997 Supp. 40-3401 may be read together to include the hospital among entities that may conduct protected peer reviews. In contrast, the Board does not have the status of peer review officer or committee under K.S.A. 1997 Supp. 65-4915(a)(4)(A), which defines them in terms of "a health care provider group." The Board is not "a health care provider group" within the meaning of 65-4915(a)(2). St. Francis states, and it appears from Exhibit B to the Protective Order, that some of the documents produced by the Board for plaintiffs' counsel were supplied to the Board by St. Francis and that they were from the hospital's own peer review activities regarding Nichelle Adams' death. According to St. Francis, it gave those documents to the Board pursuant to K.S.A. 1997 Supp. 65-4915(d), which provides, in part:

"Nothing in this section shall limit the authority . . . of . . . the state board of healing arts or other health care provider licensing or disciplinary boards of this state to require a peer review committee or officer to report to it any disciplinary action or recommendation of such committee or officer [and] to transfer to it records of such committee's or officer's proceedings . . . . Reports and records so furnished shall not be subject to discovery, subpoena or other means of legal compulsion for their release to any person or entity and shall not be admissible in evidence in any judicial or administrative proceeding other than a disciplinary proceeding by the state board of healing arts or other health care provider licensing or disciplinary boards of this state."

In conclusion, there can be little doubt that the hospital, which was required by statute to provide its peer review documents concerning Adams' death to the Board, would have standing to complain about hospital-generated documents being obtained by plaintiffs' counsel and used in this judicial proceeding. Plaintiffs' counsel obtained the documents from the Board rather than from the hos-

pital, but the hospital was required by the statute to give them to the Board. Moreover, the statute denies that the privileged status of the documents is waived on account of the hospital's giving them to the Board. In addition, the statute affords some protection for Board-generated documents:

"Any . . . record . . . relating to the investigation of a complaint about a person licensed by the board which is . . . maintained by the board is confidential and shall not be disclosed by the board or its employees in a manner which identified or enables identification of the person who is the subject or source of . . . information. . . ." K.S.A. 1997 Supp. 65-1135(a).

As we have seen, plaintiffs contend that, under K.S.A. 1997 Supp. 65-1135(a)(1), once a disciplinary proceeding is initiated the information is not confidential and is discoverable under the Kansas Open Records Act. They claim that the Board shares this view and provided its file accordingly, but disciplinary counsel's letter to plaintiffs' counsel would only partially support the claim. Months after initiating the disciplinary proceeding (and, in fact, at a time when it was very nearly completed), disciplinary counsel wrote that some of the documents in the Board's file were available under the Open Records Act and some were protected by 65-1135, 65-4914, 65-4915, and 65-4921 *et seq*. St. Francis relies on K.S.A. 1997 Supp. 45-221(a)(36) of the Open Records Act. It provides that a public agency, in this case the Board, need not disclose records made pursuant to statutory requirements that hospitals maintain risk management programs and report incidents of substandard care, which are privileged under the peer review privilege statute, K.S.A. 1997 Supp. 65-4915(b), or the risk management privilege statute, K.S.A. 65-4925(a). In other words, this provision of the Open Records Act protects hospital-generated documents.

Plaintiffs do not contend that there is a provision of the Open Records Act that pertains to the privilege-shedding effect they claim for initiation of disciplinary proceedings. Instead, their argument seems to rest solely on the language of K.S.A. 1997 Supp. 65-1135(a)(1). As we have seen, however, the statutory exception expressly applies *in* a disciplinary proceeding or an appeal from an order entered in a disciplinary proceeding. Plaintiffs' lawsuit against St. Francis and Dr. Ohaebosim is neither. Moreover, the

language of K.S.A. 1997 Supp. 65-4915(d) (and substantially similar language in subsection [b]) strongly suggests that the legislature did not intend for the disciplinary proceeding to mark a permanent change from protected to public for the documents in the Board's file.

The horse's being out of the barn in this case ironically would work to the plaintiffs' detriment if the court were to conclude that confidentiality should be reinstated after the disciplinary proceeding. In addition to the protection being lifted during the disciplinary proceeding, the horse also is out of the barn in the sense that the documents were produced for plaintiffs before the hospital sought a protective order from the district court. Of greatest interest to the plaintiffs in the documents is the information that Locke had been disciplined on another, earlier occasion for not taking charge of the care of a seriously ill patient and the names of persons with knowledge of that incident. Information about the event and names of witnesses probably could have been obtained by plaintiffs' using ordinary discovery tools; subpoenaing the Board's records was not the only means of getting them. When the Board produced the documents for plaintiffs, however, and then the district court ruled that they were privileged and quashed depositions of persons named in them, the plaintiffs effectively were prevented from developing facts that they could have and probably would have developed had it not been for plaintiffs' obtaining information from the Board's documents. The dilemma thus created for the plaintiffs runs counter to at least one of the principles that traditionally guide courts in making decisions concerning confidential material—that a party is required to exhaust available alternative sources of information before seeking a court's order compelling discovery. See, *e.g., Berst v. Chipman*, 232 Kan. 180, 189, 653 P.2d 107 (1982).

*Berst* is instructive, too, for its discussion of the court's need to balance the conflicting interests of the litigants who respectively wish to obtain and conceal information as well as any public interest in maintaining the confidentiality of the material. The case was before the court on a petition for mandamus filed by the National Collegiate Athletic Association (NCAA), which had been denied

protection by the district court for its investigative file concerning possible violations of NCAA rules in a basketball player's recruitment by the University of Alabama. The discovery dispute arose in a libel action against an Alabama newspaper that had published an article about the investigation. The NCAA was not a party to the libel suit. The court quoted *Richards of Rockford, Inc. v. Pacific Gas & Elec.*, 71 F.R.D. 388 (N.D. Cal. 1976), for the following factors to be considered "in striking a balance between discovery and nondisclosure: '[T]he nature of the proceeding, whether the deponent is a party, whether the information sought is available from other sources, and whether the information sought goes to the heart of the claim.' 71 F.R.D. at 390." 232 Kan. at 188. The court's discussion continued:

"Additional guidelines considered in balancing claims of privilege with the need for disclosure include the degree of harm that would be caused by disclosure and the type of controversy before the court. [Citations omitted.] Also, the public interest may be a reason for not permitting inquiry into particular matters by discovery." 232 Kan. at 188-89.

After reviewing a number of decisions from various courts, the court stated:

"We recognize this case presents a conflict between highly valued interests. On the one hand there is an interest in confidentiality, both to prevent embarrassment to persons who have relied on pledges of secrecy in disclosing information to the NCAA or about whom information in the file may relate, and to promote the public interest in the supervision of intercollegiate athletics to prevent corruption in that area and retain a clear line of demarcation between college athletics and professional sports. On the other hand is the interest in disclosure of all facts relevant to the respondent's defense in the libel action which will contribute to a full and fair determination of the issues in that case. This case presents a situation where a compromise solution must be reached which will sufficiently serve the interests of both parties." 232 Kan. at 192.

The motion for a protective order in *Berst* did not rest on statutorily created privilege. Indeed, one of the reasons given by the district court for denying the NCAA's motion for protective order was that "the movants 'do not come within any of the privileges created by the statutes of this state.' " 232 Kan. at 187. Thus, the limit on discovery was sought by the NCAA "under the court's supervisory powers over discovery." 232 Kan. at 187. Nonetheless,

because the statutory privileges at issue in the present case were enacted in derogation of the common law, they must be strictly construed so that the applicability of the interest balancing model found in *Berst* should not automatically be dismissed. See *State v. George*, 223 Kan. at 507, 510, 575 P.2d 511 (1978). It should be noted that St. Francis argues for a "literal and broad reading" of the privilege statutes based on legislative history and public policy. These considerations, however, rather than determining which principle of statutory construction is applicable, are elements to be weighed by the court against the litigants' interests in full disclosure of facts relevant to their allegations.

Other arguments made by plaintiffs pose various theories why the statutes relied on by St. Francis do not apply to documents in the Board's file. They contend that the hospital's documents, which consist of factual accounts and/or witness statements, are not protected because the statutes confer privilege only on the mental impressions and conclusions of persons actually performing the peer review or risk management function. Privilege does not, according to plaintiffs, pertain to factual accounts or witness statements. Moreover, the argument continues, the documents at issue in this case were not used for either peer review or risk management purposes. Plaintiffs rely primarily on federal cases that interpret the Kansas statutes. See, *e.g., Balk v. Dunlap*, 163 F.R.D. 360 (D. Kan. 1995); *Hill v. Sandhu*, 129 F.R.D. 548 (D. Kan. 1990); and *Porter v. Snyder*, 115 F.R.D. 77 (D. Kan. 1987). St. Francis contends that plaintiffs misconstrue the case law and misunderstand the hospital's procedures. In particular, the hospital contends not only that the documents generated by the hospital in its disciplinary process are completely protected, but also that the Board-generated documents containing information and names from the disciplinary forms are completely protected.

At issue in *Balk* were the minutes of meetings of the hospital's OB/GYN department's medical staff. Counsel for the hospital described the minutes

"as notes of the discussions which occur during monthly meetings of its OB/GYN medical staff about the following matters: quality of care; potential problems with patient care; review of the care provided by each of the members of the depart-

ment; compliance with the standard of care required of its members; peer review; quality assurance; and risk management." 163 F.R.D. at 361.

Counsel also stated that "the minutes are prepared and maintained as part of the requirements and procedures for peer review and risk management imposed upon Mercy as a hospital by K.S.A. 65-4915, 65-4922, 65-4923, and 65-4925." 163 F.R.D. at 361. Plaintiff argued that the hospital had to provide additional, detailed information about the documents. The federal district court disagreed: "The designation departmental staff minutes generically suggests the kind of documents which the statutes purport to protect against subpoena and discovery." 163 F.R.D. at 363. In the present case, although plaintiffs' counsel cites *Balk*, there is no attempt in the brief to distinguish the documents at issue there from those at issue here.

At issue in *Hill* were documents submitted to the hospital by a physician seeking staff privileges. As appellants represented, the federal court distinguished between documents created by a peer review committee and information supplied to the committee for review:

"Kan. Stat. Ann. § 65-4915(4)(b) clearly states that 'the reports, statements, memorandums, proceedings, findings, and other records *of* peer review committees or officers shall be privileged . . . ." [Emphasis added]. The language clearly does not include reports reviewed *by* the committee. See *Porter v. Snyder*, 115 F.R.D. 77, 78 (D. Kan. 1987). In *Porter*, Judge Kelly found that the analogous language of the risk management privilege, Kan. Stat. Ann. § 65-4925, did 'not include incident reports which [were] not reports *of* the review committee, but rather [were] contemporaneous statements of fact relating to incidents which [were] reviewed *by* the committee. Thus, incident reports are distinguishable from the committee's reports and are not included within 65-4925(a)'s protection.' [Emphasis supplied.] *Porter*, 115 F.R.D. at 78. No reason appears why the same analysis is not applicable to Kan. Stat. Ann. § 65-4915." 129 F.R.D. at 550.

The federal district court noted that, under a broader view, "virtually all medical and hospital records would be protected as privileged simply by sending them to the peer committee for review." 129 F.R.D. at 551.

The definition of "peer review" in K.S.A. 1997 Supp. 65-4915(a)(3) is quite broad, and it includes disciplinary functions:

" 'Peer review' means any of the following functions:

(A) Evaluate and improve the quality of health care services rendered by health care providers;

(B) determine that health services rendered were professionally indicated or were performed in compliance with the applicable standard of care;

(C) determine that the cost of health care rendered was considered reasonable by the providers of professional health services in this area;

(D) *evaluate the* qualifications, competence and *performance of the providers of health care* or *to act upon matters relating to the discipline of any individual provider of health care*;

(E) reduce morbidity or mortality;

(F) establish and enforce guidelines designed to keep within reasonable bounds the cost of health care;

(G) conduct of research;

(H) determine if a hospital's facilities are being properly utilized;

(I) supervise, discipline, admit, determine privileges or control members of a hospital's medical staff;

(J) review the professional qualifications or activities of health care providers;

(K) evaluate the quantity, quality and timeliness of health care services rendered to patients in the facility;

(L) evaluate, review or improve methods, procedures or treatments being utilized by the medical care facility or by health care providers in a facility rendering health care." (Emphasis added.)

A peer review officer or committee is defined as "[a]n individual employed, designated or appointed by, or a committee of or employed, designated or appointed by, a health care provider group and authorized to perform peer review." K.S.A. 1997 Supp. 65-4915(a)(4)(A).

Under the statutory definition, the function of admitting members of a hospital's medical staff is peer review. K.S.A. 1997 Supp. 65-4915(a)(3)(I). The federal court determined in *Hill*, however, that documents submitted by a physician who seeks to be admitted as a member of a hospital medical staff are not peer-review-protected documents because they were not generated by the peer review officer or committee or did not " 'delve into the mind' " of the peer review officer or committee. 129 F.R.D. at 551. The federal court firmly rejected the notion that documents generated in a hospital would be privileged simply because they "could be useful to a peer review officer or committee in performing its duties." 129 F.R.D. at 551. We agree; however, in the present case, the

disciplinary forms were generated as part of the function of evaluating the performance of a professional nurse—a health care provider within the definition of 65-4915—and acting upon matters relating to the discipline of her as an individual provider of health care. They were not documents prepared outside the hospital or independently from the disciplinary process, as was the case in *Hill* with Dr. Sandhu's documents, which he submitted to the hospital when seeking staff privileges. Moreover, the persons who signed Locke's disciplinary forms as supervisor and department director would seem to fit within the statutory definition of peer review officer or committee. Finally, it may be noted that the statutory scheme, as reflected in the language of 65-4915(d), reinforces the impression that the hospital disciplinary forms in the Board's file are part of the peer review process as envisioned by the legislature. The *Hill* rationale is discussed at greater length in connection with the constitutional question raised by the plaintiffs.

This impression is not altered by the reasoning of the decision in *Porter*. The question in that case was whether an incident report was protected under K.S.A. 1986 Supp. 65-4925(a), the risk management privilege statute. The federal court noted that the incident report was made pursuant to K.S.A. 1986 Supp. 65-4923, which required persons with " 'knowledge that a health care provider has committed an act which is or may be below the applicable standard of care or which may be grounds for disciplinary action' " (quoting K.S.A. 1986 Supp. 65-4923[a]) to report their knowledge. 115 F.R.D. at 78. The statute further provided that the report would be made to a manager, who would " 'refer the report to the appropriate executive committee or professional practices peer committee.' " 115 F.R.D. at 78 (quoting K.S.A. 1986 Supp. 65-4923[a][2]). It was up to the committee to investigate the report and take appropriate action. The reports and records of executive or review committees were privileged. 115 F.R.D. at 78 (quoting K.S.A. 1986 Supp. 65-4925[a][1]). The federal district court stated that the privilege did not extend to "incident reports which are not reports *of* the review committee, but rather are contemporaneous statements of facts relating to incidents which are reviewed *by* the committee. Thus, incident reports are distinguishable from the

committee's reports and are not included within 65-4925(a)'s protection." 115 F.R.D. at 78. In the present case, St. Francis did not rely solely on a risk management privilege.

We conclude, from the record before this court, that the following five documents, which were produced by the Board pursuant to plaintiffs' counsel's business records subpoena, are protected by a literal reading of the peer review privilege set out in K.S.A. 1997 Supp. 65-4915(b) and (d): a form titled "Disciplinary Action Documentation" and forms titled "Disciplinary Action Form." The other three documents at issue were not hospital generated. They were generated by the Board or its agents as part of its investigation of a complaint against Locke. They are: Investigative Summary, dated June 9, 1993; Investigative Summary, dated October 27, 1992; and handwritten notes and typewritten summaries of interviews of Debbie Springer and Pat Howell. In addition, the hospital is not in a position to assert a privilege with regard to these Board-generated documents.

As we have seen, though, the applicability of one or more of the health care statutory privileges to a document do not end our inquiry. The impact of the document's going public in a disciplinary proceeding may be taken into consideration, and the conflicting interests of the parties and the public are to be weighed into the deliberations. Last, we must also construe the statute so that its application in the present case is constitutional.

The plaintiffs argue that the health care privileges as applied in this case are unconstitutional. The district court made the following ruling: "This Court specifically finds that K.S.A. 65-1135, 65-4915, 65-4922, 65-4923 and 65-4925 are constitutional and, in so doing, acknowledges Via Christi's submission of legislative history (Exhibit F)." As noted in the statement of facts, plaintiffs sought a ruling on the constitutionality of the statutes in a motion filed in August 1995, and the only indication in the record that the motion was denied is the single sentence in the certification order. If the district court's reasoning was recorded, it was not designated for the record on this appeal. On appeal, plaintiffs' argument centers on due process questions raised by the district court's unrefined application of privilege.

In addition to the briefs of the parties on this issue, there is for the court's consideration the brief of *amici curiae* Kansas Hospital Association and Kansas Medical Society. They state that they are "voluntary membership organization[s]" of hospitals and doctors. They state that they are interested in the outcome of this appeal because, as health care providers, they are required by statute to conduct peer review and risk management functions. They predict that "[i]f the peer review and risk management privileges are deemed unconstitutional, . . . [f]ull, frank, open, honest and critical evaluation of health care services would be hampered [and] [p]rograms reviewing services would become less effective." Their brief, however, is of little benefit because they discuss a direct attack on the constitutional validity of the statute rather than the due process problem with the broad application given to the statute by the district court's ruling.

Plaintiffs argue that their constitutional right to procedural due process is violated by restrictions on their proof that are the consequence of the district court's application of the privilege statutes. In particular, they seem to be objecting to the district court's quashing depositions on the strength of St. Francis' assertions that the Board's documents were the source for the witnesses' names and their information about Locke. Plaintiffs contend that the right to procedural due process and a fair trial

"are so fundamental that they even override exclusionary rules of evidence (*i.e.*, privileges) that are *constitutionally* grounded. [Emphasis added.] *See, e.g., Branzburg v. Hayes*, 408 U.S. 666, [33 L. Ed. 2d 626,] 92 S. Ct. 2646 (1972) (civil litigant's procedural due process right to evidence, from a news reporter's confidential source, overrides and defeats a reporter's first amendment privilege)."

Plaintiffs cite decisions from other states for the proposition that "no statutory privilege or trial court evidentiary ruling is valid when it excludes evidence" relevant to a determination. Only those decisions that are relevant and based on constitutional premises will be discussed here.

*M. v. K.*, 186 N.J. Super. 363, 452 A.2d 704 (1982), was a child custody dispute in which the mother attempted to invoke a state statute that made communication between a marriage counselor

and the person or persons counseled confidential. The New Jersey court stated:

> "Having found this child to be a person entitled to constitutional protections, we find further that the net effect of upholding the privilege in this case would be to deprive this child of due process to which she is entitled; that is, she would be denied the right to have introduced in this proceeding material evidence relevant to a determination of what custodial arrangement is in her best interests and welfare. . . .
>
> . . . .
>
> "The constitutional rights of the infant in this case clearly outweigh the interest of the State in fostering rehabilitation of unhealthy marriages. In balancing these factors the scales of justice tip sharply in the infant's favor, and on this basis we cannot let the privilege prevail in this or any other child custody case." 186 N.J. Super. at 373-74.

The New Jersey court concluded that permitting the statutory privilege to be invoked would interfere with the child's constitutional protection. Thus, it declared that the statute "in child-custody disputes, impermissibly interferes with the aforesaid rights of children, and is unconstitutional." 186 N.J. Super. at 374.

*Linder v. Smith*, 193 Mont. 20, 629 P.2d 1187 (1981), was a declaratory judgment proceeding in which the Montana Supreme Court found that the Montana Medical Malpractice Panel Act was constitutional with the exception of the following provision: " 'No statement made by any person during a hearing before the panel may be used as impeaching evidence in court.' " 193 Mont. at 30 (quoting Mont. Code Ann. § 27-6-704[2]). The Act made it mandatory for a litigant to submit a medical malpractice claim to a screening panel, but did not bind the litigant with the decision of the panel or permit its being admitted in a subsequent judicial action. The problem with the one offending provision was expressed by the Montana court as follows:

> "It is fundamental to our adversarial system that litigants retain the right to impeach the sworn testimony of a witness testifying against them. We are mindful that this provision was enacted to aid the fact-finding by the panel and to preserve the confidentiality of the proceedings. But we cannot say that a litigant will receive a full and fair hearing if he is unable to fully cross-examine in court the witnesses that testified in the prior hearing." 193 Mont. at 30.

Although the court did not expressly find a due process violation, it impliedly did so. The court invalidated this provision of the Act and severed it before declaring that the remaining portions of the Act were constitutional. 193 Mont. at 30, 34.

*Greenwood v. Wierdsma*, 741 P.2d 1079 (Wyo. 1987), is a medical malpractice action in which the Wyoming Supreme Court considered the scope of the discovery privilege for records and data relating to a physician's accreditation and hospital activities. Of all the cases cited by plaintiffs for the proposition that a statutory privilege cannot be valid if it withholds evidence that goes to the heart of determination of the litigant's claim, this one is most nearly on point with the present case. For this reason, even though it was not decided on constitutional grounds, it will be discussed here. The lawsuit included "a claim that the hospital was negligent in granting the doctor the privilege to practice in that hospital as an obstetrician." 741 P.2d at 1087. The privilege statute at issue purported to protect " '[a]ll reports, findings, proceedings and data of such hospital medical staff committees.' " 741 P.2d at 1087 (quoting Wyo. Stat. § 35-2-602 [1977]). "Hospital medical staff committee" was defined as " 'any committee within a hospital, consisting of medical staff members or hospital personnel, which is engaged in supervision, discipline, admission, privileges or control of members of the hospital's medical staff, evaluation and review of medical care, utilization of hospital facilities or professional training.' " 741 P.2d at 1087 (quoting Wyo. Stat. § 35-2-604 [1977]). The Wyoming court stated:

"In order to prove such negligence by the hospital, a plaintiff must have access to information concerning a doctor's performance. That same information most likely will be considered by and is, pursuant to [the statutory privilege], available to the medical staff committee. A necessary consequence of construing the privilege statute to preclude a plaintiff's access to all information which is relevant to a doctor's accreditation, is to prohibit causes of action against hospitals for negligence in the accreditation and maintenance of qualified medical personnel. Thus, in determining the scope of the statutory privilege, we are also deciding whether the legislature, by enacting the privilege statute, intended to abrogate the right to recover for this type of hospital negligence." 741 P.2d at 1087.

The Wyoming court concluded that the legislature had not intended to block civil suits to recover for injuries caused by a hos-

pital's failure to perform its obligation to exercise care in offering and continuing staff privileges to physicians. Thus, it refused to "construe the privilege statute to impliedly prohibit this category of negligence actions." 741 P.2d at 1088. The statute was construed to protect hospital documents which detail the committee's "decision-making process, opinion, perspective, or final decisional results" but not materials reviewed by the committee in the course of carrying out its function. 741 P.2d at 1089.

An interesting aspect of the Wyoming opinion is the expression of the court's belief that the continued availability and vitality of causes of action against hospitals "serve an important public policy—the preservation of quality health care for the citizens of this state." 741 P.2d at 1088. Because the court believed that lawsuits against a hospital serve a common purpose with a hospital's medical staff committee, it assigned approximately equal weight to the functions of the hospital medical staff's committee and the liability suit. In the court's eyes, too, the shared purpose explained why the information necessary to one would often be the same, or overlap with, information necessary to the other. 741 P.2d at 1089.

The Kansas case relied on by plaintiffs is *Hill*, 129 F.R.D. 548. Although the documents at issue in that case differ from the ones in the present case, considerations of constitutional limitations on the breadth of the peer review privilege are the same for both. In *Hill*, the court concluded that the statutory privilege was designed to protect the deliberations of the peer review committee but not information supplied to the committee for its deliberations. 129 F.R.D. at 550. Thus, the court concluded that documents submitted by Dr. Sandhu to the peer review committee in his application for staff privileges were not privileged. Plaintiffs in the present case insist that this holding would remove the hospital's disciplinary forms from the protected class because they contain factual accounts. The forms, however, also record disciplinary actions. They seem designed to incorporate the functions of fact-gathering and the officers' or committee's conclusions and action into one document. With the documents in this form, a literal reading of the privilege statutes seems to protect St. Francis' disciplinary forms.

In *Hill,* the federal court suggests that a different approach is needed:

"The court's interpretation of the peer review statute is in line with the public policy of Kansas. By enacting Kan. Stat. Ann. § 65-4915, the Kansas Legislature intended to increase the level of health care in the state by protecting the deliberations of peer review committees. The statute says nothing about eliminating the torts of medical malpractice or the negligent awarding of staff privileges. It likewise says nothing about protecting evidence and information about such causes of action unless that information is reflective of the deliberations of the peer review committee. Had it intended to do otherwise, the legislature could have used language plainly providing for that result.

"If the court adopts the interpretation of the defendants, virtually all medical and hospital records would be protected as privileged simply by sending them to the peer committee for review. The twelve definitions of peer review listed in Kan. Stat. Ann. § 65-4915 encompasses all, or almost all, aspects of the practice of medicine. Many documents and records generated in a hospital or medical practice could be useful to a peer review officer or committee in performing its duties. If a document was to be privileged solely by the virtue of it being reviewed by a peer review officer or committee and the information in those records could not be discovered or admitted into evidence at trial, it would intolerably thwart legitimate discovery and tend to eliminate medical malpractice cases and the discovery of evidence relevant to the awarding of staff privileges contained in documents, records, and papers submitted to the peer review committee. This cannot, in the court's opinion, be the result intended. Such an interpretation could raise significant constitutional implications.

"It makes little logical sense, in the court's opinion, to conclude that information about a party, if otherwise discoverable, can be immunized from disclosure simply because it is revealed to a third party, i.e. a peer review committee or other entity. Indeed, prima facie, the disclosure to a third entity, all other things being equal, is usually equated with a waiver of the right to protect otherwise protected information.

"Equity further dictates the instant interpretation of the statute. In a significant number of medical malpractice actions, *defendants* are aware of the results of the peer review committee and would have access to the documents both favorable and adverse that were presented to the committee. Thus it would seem inequitable for the defendants, such as in this case, to be able to use the advantageous parts of the records in their defense and bar plaintiff from access to those portions, if any, which are disadvantageous to defendant." 129 F.R.D. at 550-51.

We agree with the above analysis, and it guides us in construing the statutes in the present case. We are also guided by our decision in *Berst.* In *Berst,* we recognized that the court must balance the interest of the party in obtaining the information and the interest

of the opposing party and public in maintaining confidentiality of the information. The information sought in *Berst* went to the "heart" of the issue in the case and, thus, we held that the substantive interest in preserving the confidentiality of the information "must give way to assure all the facts will be available for a fair determination of the issues in the libel action." 232 Kan. at 193.

In *United State v. Nixon*, 418 U.S. 683, 41 L. Ed. 2d 1039, 94 S. Ct. 3090 (1974), the Supreme Court was called on to weigh the Presidential privilege against the needs of the judicial process. The Special Prosecutor subpoenaed certain tape recordings and documents relating to conversations with President Nixon's aides and advisors. Nixon raised Presidential privilege against disclosure of confidential communications. The Court held that the fundamental demand of due process of law in the fair administration of justice required that the Presidential privilege yield to the specific need for evidence in a pending case. The Court said:

"The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense." 418 U.S. at 709.

Privileges in the law are not favored because they operate to deny the factfinder access to relevant information. The Court in *Nixon* noted that privileges against forced disclosure are created by the Constitution, statute, or common law, and "[w]hatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." 418 U.S. at 710.

. Plaintiffs in this case complain repeatedly of being deprived of the right to *cross-examine* witnesses and the opportunity to *impeach* witnesses with inconsistent prior statements. It appears plaintiffs' counsel has exacerbated this situation and might have obtained the relevant facts for use at trial in spite of the hospital's asserted privilege. St. Francis even suggests that this court "could allow the depositions, *but not* in the manner in which plaintiffs have taken them already wherein witnesses were asked questions along the lines: "Isn't it true you told the Board . . . ?" Nonethe-

less, the situation plaintiffs find themselves in, knowing that the hospital continued to entrust Locke to assess the conditions of emergency patients despite her demonstrated lack of initiative and self-confidence with critical patients denies the plaintiffs the opportunity to develop or otherwise use that information.

In the present case the legislature granted a peer review privilege to health care providers to maintain staff competency by encouraging frank and open discussions and thus improving the quality of medical care in Kansas. We must weigh that privilege against the plaintiffs' right to due process and the judicial need for the fair administration of justice. There can be no question that in granting the privilege, the legislature did not intend to restrict or eliminate a plaintiff's right to bring a medical malpractice action against a health care provider. To allow the hospital here to insulate from discovery the facts and information which go to the heart of the plaintiffs' claim would deny plaintiffs that right and, in the words of the federal court, "raise significant constitutional implications." 129 F.R.D. at 551. The constitutional implication was stated by this court in *Ernest v. Faler*, 237 Kan. 125, 131, 697 P.2d 870 (1985):

> "The right of the plaintiff involved in this case is the fundamental constitutional right to have a remedy for an injury to person or property by due course of law. This right is recognized in the Kansas Bill of Rights § 18, which provides that all persons, for injuries suffered in person, reputation or property, shall have a remedy by due course of law, and justice administered without delay."

We found in *Ernest* that K.S.A. 2-2457 violated due process by placing an unreasonable impediment to an injured party seeking recovery for the negligent application of chemical pesticides. We held that "[t]he right of a person injured by the tortious act of another to a remedy for his injuries in a court of law is one of the basic constitutional rights guaranteed protection by the Kansas courts." 237 Kan. 125, Syl. ¶ 3.

In the present case, we conclude that although the interest in creating a statutory peer review privilege is strong, it is outweighed by the fundamental right of the plaintiffs to have access to all the relevant facts. The district court's protective order and order granting other discovery relief denied plaintiffs that access and thus

violated plaintiffs' right to due process and a fair determination of their malpractice action against the defendants. The information generated by the peer review committee, detailing the committee's decision-making process, the officers' or committee's conclusions, or final decisions, is not subject to discovery by the plaintiffs. The district court has a duty to conduct an in camera inspection and craft a protective order which will permit the plaintiffs access to the relevant facts. Forms and documents containing factual accounts and witnesses' names are not protected simply because they also contained the officers' or committee's conclusions or decision-making process. The court can simply redact that which is protected and grant plaintiffs access to the portions containing the relevant facts.

The district court's protective orders are reversed, and the district court is directed to proceed in accordance with this opinion.

MCFARLAND, C.J., and SIX, J., not participating.

DAVID PRAGER, C.J. Retired, and DAVID S. KNUDSON, J. assigned█

LARSON, J., dissenting and concurring: While I agree with the majority as to its determination of the constitutionality of and the construction of the privilege statutes in issue, I disagree with its actions in retaining an interlocutory appeal which was filed beyond the clearly stated time period established by our statutes and rules.

The considerable delay at all earlier stages of these proceedings (cause of action arose in July 1992; suit filed July 20, 1994; discovery motion argued June 1995 but not journalized until October 1996; permission to take interlocutory appeal granted December 10, 1996; notice of appeal filed January 3, 1997) is not a sufficient reason for us to retain an appeal filed too late.

The majority correctly sets forth K.S.A. 60-2102(b) (nearly identical to the federal interlocutory appeal statute, 28 U.S.C. § 1292[b] [1994]), which brings into play Supreme Court Rule 4.01 (1997 Kan. Ct. R. Annot. 26) and fixes the time for the notice of appeal to be filed as being "within the time fixed by K.S.A. 60-2103, for taking an appeal or within ten (10) days after permission to appeal is granted, whichever is later." Because more than 30 days had elapsed from the entry of the district court's order from which the appeal was taken, the time within which this appeal had to be filed was 10 days from December 10, 1996.

The appeal was filed January 3, 1997, 24 days later.

Thus, after first obtaining the approval of a district judge and then the Court of Appeals to grant a discretionary appeal because (1) the issue involves a controlling question of law, (2) as to which there is a substantial ground for difference of opinion, and (3) an immediate appeal may materially advance the ultimate termination of the litigation, the appellant filed a notice of appeal which was 14 days late.

I recognize the distinction between time periods established by statute and those established by our rules, as was discussed in *Jones v. Continental Can Co.*, 260 Kan. 547, 558, 920 P.2d 939 (1996). While a majority of this court has the right to do as it has done, I am of the opinion it is a mistake. The majority opinion should not be read as authority to rely on the whim of the court to save the dilatory acts of counsel.

I do agree with the majority's statement that any attempt to interpret Rule 4.01 to grant 30 days after a permission to accept an interlocutory appeal is granted within which to file a notice of appeal defies logic and has absolutely no merit.

While the specific issue is only collaterally before us, I also question the wisdom of granting interlocutory appeals on discovery issues notwithstanding the involvement here of questions of privileges. I recognize the divergent views as to the granting of interlocutory appeals, see Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction 2d §§ 3929-31 (1996); *Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697, 702-03 (5th Cir. 1961), but when

the time line of this case is analyzed, it should be before us after a trial rather than in its present posture.

If we had a statute or rule that expedited interlocutory appeals or we were waiting with clean dockets to quickly decide cases like this, a better justification for taking interlocutory appeals such as this one would be present. Neither of these conditions exists.

While the majority has answered difficult questions which at some point needed to be decided and our result might have required a new trial had this case been tried with the appealed-from discovery orders in effect, I still believe litigants are better served if we answer questions like this after a trial has been held. Our longstanding rules requiring finality before permitting appeals are clearly justified.

This appeal should have been dismissed at the time St. Francis' motion to dismiss was considered by the Court of Appeals on February 21, 1997. Having failed to take that opportunity to recognize the appeal was filed out of time, we should do so now.