AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, LOCAL 1941, AFL–CIO, Petitioner,

v.

FEDERAL LABOR RELATIONS AUTHORITY, Respondent.

No. 87–1076.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 2, 1987.

Decided Jan. 19, 1988.

Anne M. Wagner, with whom Mark D. Roth, Washington, D.C., was on the brief, for petitioner.

Arthur A. Horowitz, Associate Sol., Federal Labor Relations Authority, with whom Ruth E. Peters, Sol., FLRA, William E. Persina, Deputy Sol., FLRA, and Elsa D. Newman, FLRA, Washington, D.C., were on the brief, for respondent.

Before RUTH BADER GINSBURG and STARR, Circuit Judges, GESELL[*], District Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by District Judge GESELL.

Dissenting opinion filed by Circuit Judge STARR.

GESELL, District Judge:

This is a Petition for Review of an Order of the Federal Labor Relations Authority ("FLRA").[1] The Authority, by divided opinion, held that the credentials committee of an Army hospital about to conduct a hearing to consider adverse information relating to the medical procedures and proficiency of a certified ophthalmologist employed at the hospital did not commit an unfair labor practice when it refused the employee's request to have his union representative with him at the hearing. We have jurisdiction to review under 5 U.S.C. § 7123(a), and having determined the challenged Order was contrary to the requirements of 5 U.S.C. § 7114(a)(2)(B), reverse.

## BACKGROUND

The underlying facts are largely stipulated and none is in dispute. Administration of medical practitioners at Noble Army Hospital, Fort McClellan, Alabama, is guided by the provisions of Army Regulation ("AR") 40–66, entitled *Medical Record and Quality Assurance Administration.* The Regulation outlines, among other things, a procedural system for convening a credentials committee to review and act upon information regarding the lack of professional conduct, substandard medical practice, or incompetence of any physician detrimental to patient health or safety.

A meeting of the committee may be called by the chairperson of the committee, the hospital commander, or the chief of the department to which the practitioner is assigned. The committee consists of management officials, supervisors and chiefs of various medical departments. The credentials committee has authority to recommend to the commander modifications or withdrawal of clinical privileges. When adverse recommendations of the committee are forwarded to the commander, who has final authority, he may place limits on the practitioner's medical services or terminate his employment. In addition, the commander in his discretion may summarily suspend or limit a practitioner's clinical privileges pending inquiry by the committee.

Once convened, the credentials committee is authorized to conduct investigations or appoint an officer to investigate if more information is needed. The committee then reviews the adverse information gathered to determine whether or not to take action. If the committee determines action should be taken, then it may either initiate summary action to suspend or reduce clinical privileges, or a hearing committee may be called to review the adverse information prior to final recommendation.

When it is determined that information warrants convening a hearing committee, the Army regulation requires that the practitioner under investigation be notified of the hearing. The practitioner is then entitled, although not required, to attend the hearing. If the practitioner chooses to attend he has the right to present evidence, call witnesses, cross-examine witnesses and consult his legal counsel, although legal counsel may not actively participate in the

[*] Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Department of the Army, U.S. Army Medical Department Activity (Noble Army Hospital) Fort McClellan, Alabama and American Federation of Government Employees, Local 1941, AFL–CIO, Case No. 4–CA–50151, 24 FLRA 487 (24 FLRA No. 53) (December 15, 1986).

hearing process. When he appears he is also subject to examination. After the hearing is conducted, the hearing committee determines its recommendations by majority vote and forwards them to the commander with a summarized record, findings and recommendations. The commander then has final authority to decide whether to limit or suspend clinical privileges. The practitioner is also provided with a record of the proceedings and may appeal from the commander to higher headquarters within 10 workdays of the commander's final decision.

Dr. Hanna, an ophthalmologist employed at Noble Army Hospital, came under review through this process. In late September 1984, during an ongoing audit of Dr. Hanna's inpatient and outpatient medical records, Colonel Hood, the commander at the hospital, advised him orally to stop treating patients. Dr. Hanna did not perform surgery at Noble Army Hospital after August 3, 1984, and did not work between September 10, 1984 and November 20, 1984.

On October 1, 1984, the hospital scheduled a meeting of its credentials committee to review the preliminary findings of the audit. The auditing ophthalmologist reported the following conclusions: Dr. Hanna had used outdated treatment techniques; he had rendered poor medical care in general; and the majority of case records audited contained deficient evaluation and documentation. As a result of these preliminary determinations, the committee decided to continue suspension of Dr. Hanna's surgical privileges and scheduled a meeting of the hearing committee on October 17 to make a final recommendation to the commander.

On October 3, Dr. Hanna was notified of the committee's scheduled review hearing and of the specific allegation brought against him. Dr. Hanna indicated he would attend with his lawyer and asked to have a representative of his union, American Federation of Government Employees, Local 1941, AFL–CIO ("AFGE"), petitioner here, attend with him. His request to be accompanied by his union representative was denied. The hearing went forward.

The hearing committee consisted of management officials and military officers who were supervisors and chiefs of various hospital departments, as well as the ophthalmologist who had conducted the audit. At the hearing on October 17, 1984, Dr. Hanna cross-examined the physician who had conducted the unfavorable audit. He also made an opening statement, testified, called witnesses on his own behalf, and answered the hearing committee's questions. The next day the hearing committee issued its findings, recommended that Dr. Hanna's privileges be restricted, and commented on various aspects of his deficiencies, while acknowledging Dr. Hanna had partially rebutted some of the allegations brought against him.

On December 12, 1984, Colonel Hood adopted the committee's recommendations and advised Dr. Hanna that he had the right to appeal to the Health Services Command and ultimately to the Office of the Surgeon General of the Army. Dr. Hanna did not appeal. He resigned in January 1985, and died later the same year.[2]

Dr. Hanna's union, AFGE, the petitioner here, is the exclusive representative of medical practitioners at the Noble Army Hospital. Alleging that the hospital's rejection of Dr. Hanna's request to have a representative of that union with him at the hearing committee meeting constituted an unfair labor practice under the Federal Service Labor–Management Relations Statute, 5 U.S.C. §§ 7116(a)(1), –(8), 7114(a)(2)(B) (1982 and Supp. III 1985), AFGE complained to the Authority but was denied relief. The resulting Order of the

---

**2.** This controversy is not mooted by Dr. Hanna's death. As exclusive representative of Dr. Hanna's bargaining unit, AFGE has a derivative right to be present, on the employee's request, at an examination reasonably believed by the employee potentially to result in disciplinary action. 5 U.S.C. § 7114(a)(2)(B). Thus the Union itself has standing to contest the denial of representation as an unfair employment practice. Available remedies may include a cease and desist order or the posting of an unfair labor practice notice. *See, e.g., AFGE v. FLRA,* 777 F.2d 751, 753 n. 13 (D.C.Cir.1985).

Authority now comes before this Court for review.

## DISCUSSION

The standard for judicial review of FLRA orders is prescribed by the Administrative Procedure Act, 5 U.S.C. § 706. *See* 5 U.S.C. § 7123(c). Under this standard, the Court must set aside decisions of the FLRA found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 706(2)(A). While the Authority's decision should be given the deference properly owed to an expert tribunal interpreting its enabling statute, reviewing courts must not "rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (citation omitted).

Cognizant of these principles, the Court turns to an examination of the FLRA's construction of § 7114(a)(2)(B). Section 7114(a)(2)(B) reads as follows:

(2) An exclusive representative of an appropriate unit in an agency shall be given the opportunity to be represented at—

. . . .

(B) any examination of an employee in the unit by a representative of the agency in connection with an investigation if—

(i) the employee reasonably believes that the examination may result in disciplinary action against the employee; and

(ii) the employee requests representation.

Thus, four conditions must be met before a statutory right to union representation vests in a federal employee: (1) the meeting between the employee and management must be an examination; (2) the examination must be in connection with an investigation; (3) the employee must reasonably believe that disciplinary action may result from the meeting; and, (4) the employee must request representation. Since it is undisputed and stipulated that Dr. Hanna had the requisite belief and requested representation, the sole issue is whether or not the above-described committee process involves an examination of Dr. Hanna in connection with an investigation. While it was apparent that the committee hearing constituted an investigation into the results of the audit, a factor the Authority's General Counsel considered decisive in requiring representation, if requested, the Authority held that the hearing did not involve an examination within the meaning of § 7114(a)(2)(B) because it would have been held anyway—whether or not Dr. Hanna attended—and he was not required to attend.

Examination is not a term defined by the statute. A hearing was scheduled after an investigation by audit of Dr. Hanna's practice, which led to a temporary suspension. The commander had already suggested he resign and the chairman of the committee informed him he should be present. What followed was questioning during an inquiry in search for the truth.[3] The Authority was at best technically accurate when it said that "the hearing was not designed 'to ask questions, elicit additional information, have the employee admit his alleged wrongdoing, or explain his conduct,'"[4] 24

---

3. *Cf. National Treasury Employees Union v. FLRA*, 835 F.2d 1446, 1450 (D.C.Cir.1987) ("'Examination' involves questioning to secure information.").

4. The Authority mischaracterizes Dr. Hanna's role in the decredentialing process. Dr. Hanna's participation is portrayed by the Authority as that of a "passive observer" whose impact on the results of the hearing is incidental and insignificant and whose presence is "purely optional" —like an extra water pitcher. This view is blind both to the reality of what occurred and the process mandated by the regulations. Far from structuring a minor role for the practitioner in the hearing process, the Army regulations: provide that a hearing committee may be convened at the request of the practitioner (AR 40–66, para. 9–17(c)(1)); vest the practitioner with the right to present his side of the story (AR 40–66, para. 9–17(d)(2)); provide that if the practitioner fails to request a hearing or fails to appear at the hearing, he or she waives all appeal rights (AR 40–66, para. 9–17(a)); require the commit-

F.L.R.A. at 491, because those events would not have taken place had Dr. Hanna declined to attend. The fact he had the privilege to absent himself, however, should not control. This hearing is the only hearing he ever would have. It settled the facts. The statutory right to have a representative present attaches only where the practitioner is himself willing to attend and, as a practical matter, he has no choice but to attend. The circumstances left no doubt that the hearing was vital to Dr. Hanna's employment. The realities of the committee credentialing process cannot be ignored. It is obvious Dr. Hanna was in fact compelled to attend if he wished to be heard on the issues relating to his professional competence and continued career at Noble Army Hospital. The record was about to be developed. He knew he faced disciplinary action which could include the loss of his job. His future at the hospital and his professional standing among his peers depended on his attending and hopefully dissuading them from imposing limitations upon or terminating his employment at the hospital. Moreover, it is clear from what actually occurred that his appearance was not only active but served to rebut the allegations in part.[5]

Counsel for the Authority, both in their written submissions and during oral argu-

ment, focused their attention upon a single decision of the United States Supreme Court. Respondent's brief stated that "the legislative history of section 7114(a)(2)(B) discloses that it was enacted in response to the decision of the Supreme Court in *National Labor Relations Board v. J. Weingarten, Inc.*, 420 U.S. 251 [95 S.Ct. 959, 43 L.Ed.2d 171] (1975)" and intended "to make the *Weingarten* right applicable to federal employees." Brief for Respondent, p. 9. Further, it is stated that "while Congress intended to base the language of section 7114(a)(2)(B) upon the *Weingarten* decision, Congress anticipated that the statutory right to representation in examinations may evolve differently in the federal sector." *Id.* at 10–11; *see* H.R.Rep. No. 95–1717, 95th Cong., 2d Sess. 155–56 (1978). These are entirely accurate statements, but, contrary to the claims advanced by counsel for the Authority at argument, the principles underlying that decision do not hinge on whether or not an employee is *formally ordered* to attend a disciplinary hearing.[6] Justice Brennan, speaking for the majority of the Court in *Weingarten*, affirmed the right of a private employee to have the support of his union representative, if the employee so requested, at an investigation when the employee reasonably believes he will be subjected to disci-

---

tee to review all the evidence presented, including that of the practitioner (AR 40–66, para. 9–17(d)(4)); and obligate the hearing committee to fully inform itself of the facts and circumstances underlying the allegations under investigation (AR 40–66, para. 9–17(d)(1)). It is difficult to imagine a medical practitioner whose career is threatened by serious allegations not playing a strong, affirmative role in defending himself, especially when the regulations provide a full opportunity to do so.

**5.** The dissent argues that Dr. Hanna had no need for union representation because the hearing procedures afforded him the right to consult with an attorney. *See infra* dissent at 502. That analysis wholly undercuts the union's independent, though derivative, right to monitor employer practices. *See Weingarten,* 420 U.S. at 260–61, 95 S.Ct. at 965–66. ("The union representative ... is ... safeguarding not only the particular employee's interest, but also the interests of the entire bargaining unit by exercising vigilance to make certain that the employer does not initiate or continue a practice of im-

posing punishment unjustly."). The union's interest is not vindicated by the presence of counsel for the employee, and the dissent's approach is particularly troubling given the posture of this case. Dr. Hanna's death leaves the union sole petitioner for review of the FLRA decision.

**6.** Some courts have held that "[c]ompelled participation by the employee is ... necessary before the right to representation is implicated under *Weingarten.*" *See, e.g., Alfred M. Lewis, Inc. v. NLRB,* 587 F.2d 403, 411 (9th Cir.1978). Compulsion surely means more than an overt threat of discharge if one does not appear for interrogation. It can arise more subtly out of the nature of the alleged conduct being considered and the lack of any alternative to defend against discharge. Here, Dr. Hanna was notified of his right to appear and affirmatively participate in the hearing, and it was strongly suggested that he do so. Moreover, faced with the potential consequences of the hearing and his lack of alternative recourse, Dr. Hanna was in reality forced to defend himself by attending the hearing.

plinary action. The Court gave full support to the right of the employee who perceived a threat to this employment security to have the "aid or protection" of his union and recognized the concomitant interest of a union to assist not only the individual interests of the employee but also to be vigilant lest unjust employer practices develop. *Weingarten,* 420 U.S. at 260, 262, 95 S.Ct. at 965, 966.

*Weingarten* involved different, less formalized circumstances that arose in a store where the employee was summoned to an interview with the store manager concerning a possible theft of $1.98. This opinion and its companion decision, *Garment Workers v. Quality Mfg. Co.,* 420 U.S. 276, 95 S.Ct. 972, 43 L.Ed.2d 189 (1975), both had their genesis in appeals by employers of cease and desist orders issued by the Authority prohibiting employers from compelling employee attendance at investigatory interviews, where a threat of discharge existed, unless union representation was permitted. Viewed from a narrow factual and procedural perspective, it is true that compelled attendance was a factor considered by the Court. However, as both parties rightly point out, Congress sought to appropriate the general principles of *Weingarten* and allow those principles to evolve in the unique and varying circumstances of federal employment, not to hold those principles to the factual and procedural context of *Weingarten.*[7] That holding focused on the employee's right to act collectively with his union representative to protect his job interest. The decisive consideration governing the employee's right to union representation was not whether the employee was formally required to respond to an investigation of his conduct but whether he wanted union support and reasonably believed he faced disciplinary sanc-

tions. Both these factors were present here. Moreover, as previously emphasized, the decredentialing process in fact compelled attendance. The hearing before the committee involved both an examination and investigation and since Dr. Hanna admittedly had reasonable grounds to believe he would be disciplined, § 7114(a)(2)(B) should have been given full force and effect.

### CONCLUSION

After affording the Authority "considerable deference" we are nonetheless obliged to hold that its Order under review is not in accord with the plain meaning of the statute and contravenes the intent of Congress. Accordingly, the Petition for Review of a Final Order of the Federal Labor Relations Authority is granted and said Order is set aside as inconsistent with § 7114(a)(2)(B).

*Reversed.*

STARR, Circuit Judge, dissenting:

I respectfully dissent. The statutory provision in question, 5 U.S.C. § 7114(a)(2)(B) (1982), was designed to accord federal employees the right recognized by the Supreme Court in *National Labor Relations Board v. Weingarten, Inc.,* 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975). In my view, the events giving rise to this case do not implicate the concerns informing *Weingarten;* the FLRA was therefore entirely correct in concluding that the hospital had no obligation to grant the physician-employee's request for union representation. In reading the statute (and *Weingarten*) to the contrary, the court today not only loosens *Weingarten* from its moorings but in the process does damage to bedrock principles governing the delicate

---

**7.** The employees in *Weingarten* and in the instant case faced different alternatives in deciding whether or not to attend the meeting with their employer, albeit the possible result of their non-attendance was the same—loss of their job. The employee in *Weingarten,* if given the choice whether to attend without union representation or not attend at all, still could rely on her statutory right to a grievance proceeding if she felt she was improperly discharged. *Weingarten,* 420 U.S. at 263, 95 S.Ct. at 966. Dr. Hanna

had no such alternative. If he failed to attend the meeting of the hearing committee, or in the event the hospital had not called such a meeting, had not exercised his right to request such a hearing be convened, under Army regulations he would have waived any right to appeal adverse action taken against him. AR 40–66, para. 9–17(a). Thus, Dr. Hanna's attendance at the hearing and union representation there had even greater potential consequences than for the employee in *Weingarten.*

relationship between court and agency in the interpretation of statutes.

## I

The parties (and my colleagues) are in accord that the underlying purpose of section 7114(a)(2)(B) is to protect the right of a federal employee to have a union representative present at an investigatory confrontation with the employer. A review of the facts in *Weingarten* illustrates the nature of such right-triggering confrontations. *Id.* at 254–56, 95 S.Ct. at 962–63. In that case, an employee, suspected of stealing from her employer, was summoned to an interview with the store manager and a company security officer. Although the security officer had surreptitiously observed the employee for two days and detected nothing amiss, another employee reported seeing the suspect undercharge herself for a purchase. Based on this report, the security officer questioned the employee about the incident while the store manager looked on. The employee repeatedly asked that a union representative be called to assist her in the interview, but each time her request was denied. After the employee provided an explanation of her actions, the security official left to verify her story. The officer returned, informed the still-detained employee that her story had checked out, and told her that the matter was closed.

The interview, however, did not in fact conclude. Bursting into tears, the employee blurted out that she had never taken anything from the store without paying for it, save for the free lunches to which she was entitled under company policy. At that point, the store manager and security officer, believing Weingarten's "free lunch" policy to be inapplicable to this particular store, resumed the interrogation. Once again, the employee requested union representation, but once again the request was denied. Based on the employee's responses, the security officer prepared a written statement, which included his computation of the money owed by the employee for her supposedly "free" lunches. The employee refused to sign the statement. Only when the security officer learned by telephone communication with Weingarten's headquarters that it was uncertain whether free lunches were permitted at that particular store did the officer terminate the interview.

## II

Needless to say, the situation that gave us the *Weingarten* rule is far removed from the circumstances presented by Dr. Hanna's relationships with his fellow physicians at Noble Army Hospital. In contrast to the informal, involuntary interview in *Weingarten*, the hearing at issue in this case was a structured, formal proceeding complete with written findings and a record. In the present case, Dr. Hanna received advance notice of the hearing, to be conducted by his professional colleagues. The notice included both the specific areas of inquiry and the names of witnesses who would testify. *Critically, Dr. Hanna was neither required to attend the hearing nor, if he chose to attend, to participate in the proceeding.*[1]

---

1. It will not do to suggest that Dr. Hanna had, as a practical matter, no choice but to appear and participate in the hearing. *Weingarten* was addressed to the type of situation where the employee became duty bound to participate in and respond to the employer's investigation. Failure by a *Weingarten*-type employee to respond could obviously be viewed, and reasonably so, by an employer as an act of insubordination. Here, in contrast, it could not be clearer that Dr. Hanna would in no wise be committing an act of insubordination if he had availed himself of his right not to participate at all. Indeed, nothing has been suggested to indicate that Dr. Hanna could not have made his views known to his reviewing colleagues in writing had he so desired and thus avoided the unpleasantness of a hearing about his own competence.

On a related point, any notion that employees have the *right* to attend investigatory hearings is simply incorrect. It is entirely permissible for a federal employer to present an employee with the unhappy choice of attending an interview without a union representative or not being interviewed at all. *See United States Air Force, 2750th Air Base Wing Headquarters, Air Force Logistics Command, Wright–Patterson Air Force Base,* 10 F.L.R.A. 97 (1982) (employer permissibly terminated interview upon request by employee for union representative to be present); *United States Air Force, 2750th Air Force Base*

Electing both to attend and participate actively at the hearing, Dr. Hanna was not, like the tearful employee in *Weingarten,* left to fend for himself. To the contrary, hospital procedures afforded Dr. Hanna the right to consult with an attorney throughout the proceeding, an opportunity of which he availed himself. It seems clear beyond cavil that any protections afforded by a union representative to a besieged employee in an investigative interview were more than adequately provided by a lawyer of Dr. Hanna's own choosing.

Paralleling the striking procedural dissimilarity of the *Weingarten* setting and that involved here is the complete difference in the nature of the proceedings. The committee hearing in this case involved a professional performance review conducted by Dr. Hanna's peers, including, as required, a member of his medical specialty. The hearing was designed to examine and evaluate the report prepared by one of Dr. Hanna's fellow ophthalmologists in order to determine whether Dr. Hanna's medical techniques were acceptable. The panel was not convened to uncover facts, much less elicit a confession. Indeed, since attendance by Dr. Hanna at the hearing was voluntary, the committee of physicians could scarcely have anticipated relying on him as a source of information.

Viewed through the prism of *Weingarten,*[2] Congress' use in the statute of the pivotal word "examination" comes more clearly into focus. The natural meaning of "examination" is an employer's specifically interrogating an employee. That is to say, an "examination" occurs when the employer directs inquiries at an identifiable employee in a setting aimed at ferreting out facts of possible wrongdoing. Indeed, as this court reiterated just the other day in interpreting section 7114(a)(2)(B), " '[e]xamination' involves questioning to secure information." *National Treasury Employ-*

*ees Union v. FLRA,* 835 F.2d 1446, 1450 (D.C.Cir.1987). That is manifestly not what happened here.

What is more, the term "examination" does not stand alone. The statute refers to an "examination ... in connection with an investigation." The employer, in the midst of an inquiry, zeroes in on a particular employee. These terms, taken together, conjure up in the objective reader's mind an employment analogue to custodial interrogation in the criminal justice setting. Again, that is a far cry from Dr. Hanna's circumstances.

### III

It may well be that there exists a middle category of situations that implicate *Weingarten* concerns, but nonetheless fail to partake of the specific attributes of a custodial-type interrogation by an employer. My views should not be taken to suggest any prejudgment on my part as to situations that might fit within that conceivable (and possibly broad) category. But Dr. Hanna's situation at Noble Army Hospital strikes me as the polar opposite on the *Weingarten* spectrum. Indeed, it is as far removed from *Weingarten* and the values that the Court was seeking there to vindicate as any case we are likely to encounter. Today's holding, therefore, dramatically expands the reach of an important procedural safeguard far beyond anything which Congress intended.

In consequence, today's result does violence not only to Congress' intent, but to the Supreme Court's teachings that the judiciary is not to impose its own views on the agency which Congress has seen fit to create and charge with the administration of a statute. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83,

*Wing Headquarters, Air Force Logistics Command, Wright–Patterson Air Force Base,* 9 F.L.R. A. 117 (1982) (same).

**2.** Lest there be any confusion, I am by no means suggesting that section 7114(a)(2)(B) is limited to *Weingarten's* facts. I am simply attempting to discern from *Weingarten* the type of

situation Congress intended to encompass in creating what Congress itself envisioned as *Weingarten*-type rights. As I see it, *Weingarten* circumstances involve an employee, confronted by his employer with charges of misconduct, who is questioned without a reasonable opportunity to have advice and support.

81 L.Ed.2d 694 (1984); *INS v. Cardoza–Fonseca,* —— U.S. ——, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Indeed, the appropriate role of the courts in the interpretation of statutes was reiterated only the other day by Justice Brennan, writing for a unanimous Court in *NLRB v. United Food & Commercial Workers,* —— U.S. ——, ——–——, 108 S.Ct. 413, 421–22, 98 L.Ed.2d 429 (1987); *see also id.* at ——, 108 S.Ct. at 426 (Scalia, J., concurring) (specifically disapproving two recent holdings of this court as erroneous under *Chevron*). Since my colleagues depart from what I believe to be controlling principles of law, I am constrained respectfully to register my dissent.

