# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 18, 2017       Decided August 18, 2017

No. 15-1312

MIDWEST DIVISION - MMC, LLC, DOING BUSINESS AS
MENORAH MEDICAL CENTER,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

NATIONAL NURSES ORGANIZING
COMMITTEE-KANSAS/NATIONAL NURSES UNITED,
INTERVENOR

———

Consolidated with 15-1359

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Shay Dvoretzky* argued the cause for petitioner. On the briefs was *Noel J. Francisco*.

*G. Roger King* was on the brief for *amicus curiae* HR Policy Association in support of petitioner.

*William E. Quirk* was on the brief for *amici curiae* The American Hospital Association, et al. in support of petitioner.

*Kellie J. Isbell*, Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, *Robert J. Englehart*, Supervisory Attorney, and *Jeffrey W. Burritt*, Attorney.

*Nicole J. Daro* argued the cause for intervenor. On the brief was *Brendan White*.

Before: GARLAND, *Chief Judge*, and KAVANAUGH and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* KAVANAUGH.

SRINIVASAN, *Circuit Judge*: Kansas law calls for hospitals to establish an internal peer-review program to monitor the quality of care furnished by their medical professionals. As required by state law, Menorah Medical Center, a Kansas acute-care hospital, formed a peer-review committee for the facility's nursing staff. The committee examines alleged violations of the applicable standard of care by the hospital's nurses and reports serious breaches to the state licensing agency.

This case arises out of the peer-review committee's investigation of two nurses for substandard conduct. Menorah denied the nurses' requests to allow a union representative to accompany them in their hearings before the

committee.  Menorah also refused the union's request for a variety of information about the committee's operations.  Additionally, the hospital maintained a confidentiality rule barring employees from discussing incidents within the committee's purview.

Those actions by Menorah led the union to file unfair-labor-practice charges against the hospital.  The National Labor Relations Board ultimately found that Menorah had violated the National Labor Relations Act in the various ways alleged.  Menorah now petitions for review of the Board's decision against it.

We set aside the Board's determination that Menorah improperly denied the nurses' requests for union representation in the peer-review-committee hearings:  when, as here, employees are not obligated to take part in an investigatory hearing, there is no requirement that they be permitted to bring a union representative if they elect to participate.  We sustain the Board's decision in all other respects, including the Board's finding that Menorah committed unfair labor practices in denying the union's request for information about the peer-review committee and in maintaining a confidentiality rule barring workers from discussing incidents subject to the committee's oversight.  Accordingly, we grant Menorah's petition for review in part and enforce the Board's order in part.

I.

A.

1.  Section 7 of the National Labor Relations Act establishes the right of employees "to bargain collectively through representatives of their own choosing, and to engage

in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8 of the NLRA declares it to be "an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]" or "to refuse to bargain collectively with the representatives of his employees." *Id.* § 158(a)(1), (5).

As relevant here, Section 8 has been construed to impose three obligations on employers. First, an employee must be allowed to bring a union representative to any investigatory interview she is required to attend if she reasonably believes the interview might result in disciplinary action. *See NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 256 (1975). Second, absent an overriding need for confidentiality, employers must furnish to labor unions (upon request) information bearing on the administration of a collective-bargaining agreement. *See Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303 (1979). Third, employees presumptively must be permitted to communicate with one another in service of their Section 7 rights. *See Martin Luther Mem'l Home, Inc.*, 343 N.L.R.B. 646, 646 (2004).

2. Kansas state law aims to "protect the public's general health, safety and welfare" by establishing a peer-review system to monitor the quality of care provided by medical practitioners. Kan. Stat. Ann. § 65-4929(a). Under state law, every hospital must maintain a risk-management program designed to identify violations of the applicable standard of care and to facilitate the reporting of breaches to the Kansas State Board of Nursing (the Nursing Board). *See id.* §§ 65-4922(a), 65-4923.

A hospital's risk-management personnel must refer any qualifying incidents to a peer-review committee established

by the facility. *Id.* § 65-4923(a)(2). Menorah's committee for its nursing staff is called the Nursing Peer Review Committee. The Committee must in turn "report to the appropriate state licensing agency"—here, the Nursing Board—anytime it finds that a nurse has "acted below the applicable standard of care" in a way that "had a reasonable probability of causing injury to a patient, or in a manner which may be grounds for disciplinary action by the appropriate licensing agency." *Id.* If the Nursing Board elects to strip a nurse of his license, he can no longer practice professional nursing in the state. *Id.* § 65-1114(a)(1).

The Nursing Peer Review Committee does not itself impose that (or any other) form of state-administered discipline. Rather, the Committee collects information and refers reportable incidents to the Nursing Board so that "the [Board] may take appropriate disciplinary measures." *Id.* § 65-4923(a)(2). Under the Kansas statute, though, the members of hospitals' peer-review committees are deemed "state officers engaged in a discretionary function." *Id.* § 65-4929(b).

Kansas law attaches a confidentiality privilege to certain aspects of peer-review proceedings:

> [T]he reports, statements, memoranda, proceedings, findings and other records submitted to or generated by peer review committees or officers shall be privileged and shall not be subject to discovery, subpoena or other means of legal compulsion for their release to any person or entity or be admissible in evidence in any judicial or administrative proceeding. Information contained in such records shall not be discoverable or admissible

at trial in the form of testimony by an individual who participated in the peer review process.

*Id.* § 65-4915(b).

Menorah sought to fortify confidentiality protections through a provision of its Risk Management Plan. The hospital's Confidentiality Rule prohibits employees from "disclos[ing] information concerning reportable incidents except to their superiors, Hospital Administration, the Risk Manager, the appropriate Hospital and Medical Staff committees, legal counsel for the Hospital, or the applicable licensing agencies," without prior approval from the "Risk Manager, Administration, or legal counsel." D.A. 69.

Menorah and the union representing its nurses, the National Nurses Organizing Committee, have entered into a collective-bargaining agreement. Because the bargaining unit is comprised of registered nurses, a nurse who loses her license also relinquishes her union representation.

B.

In May 2012, Menorah nurses Sherry Centye and Brenda Smith received letters from the hospital's Risk Manager alleging that they had "exhibited unprofessional conduct as defined by the Kansas Nurse Practice Act." *Id.* at 71, 73. The letters informed both nurses that their "conduct has preliminarily been determined to be a Standard of Care Level 4: *grounds for disciplinary action*." *Id.* They were then reminded that, "[a]s governed by Kansas Statute, a final Standard of Care Level 4 determination must be reported to the Kansas Board of Nursing." *Id.*

The letters afforded each nurse "an opportunity to address the Peer Review Committee regarding any potentially reportable incident prior to any final determination of a Standard of Care by the Committee." *Id.* But the letters specified that an in-person exchange would take place only "if you choose." *Id.* Each nurse was also given the option to "submit a written response to the Committee if you wish in lieu of an appearance." *Id.* Centye's letter further stated that "the Committee cannot fairly and accurately make a final decision without more details that can only be provided by you." *Id.* at 71.

Both nurses asked the hospital's Risk Manager to allow a union representative to accompany them to their hearings before the Peer Review Committee. Centye requested union assistance before her interview began; Smith did so after her interview had commenced. The Risk Manager denied both requests, and the hearings proceeded with both nurses' participation. After the hearings, the Committee reduced each nurse's standard-of-care violation to a level 2, meaning that it would not be reported to the Nursing Board.

After the first hearing, a union representative, Sheilah Garland, communicated with Menorah's Human Resources Department. She requested information pertaining to (i) the structure and functions of Menorah's Nursing Peer Review Committee and its members; (ii) allegations against nurses investigated by the Committee (and the sources of those allegations); and (iii) any discipline issued by the Committee. Garland also maintained that nurses appearing before the Committee are entitled to bring a union representative.

Menorah provided Garland with a copy of the hospital's Risk Management Plan but otherwise declined to supply information responsive to her requests. Menorah's Director

of Labor Relations stated that the Committee cannot impose discipline but merely investigates and reports to the Nursing Board; that the requested information was privileged by Kansas law; that the information in any case did not pertain to administration of the collective-bargaining agreement; and that the nurses had no entitlement to the presence of a union representative at peer-review hearings.

The Union filed unfair-labor-practice charges against Menorah with the Board. The Board's General Counsel issued a complaint alleging that Menorah had violated the NLRA by (i) denying both nurses' requests for a union representative at their hearings before the Peer Review Committee; (ii) refusing to furnish the information about peer-review proceedings that had been sought by the Union; and (iii) maintaining an unduly broad confidentiality rule that operated to restrict discussion among employees about incidents within the Committee's ambit.

In December 2013, an ALJ issued a decision and recommended order finding that Menorah had violated the NLRA as alleged. On August 27, 2015, the NLRB affirmed the ALJ's determinations that Menorah had violated the NLRA in the three alleged respects. The Board also affirmed the ALJ's decision to admit testimony that shed light on the Nursing Peer Review Committee's proceedings.

Menorah now petitions for review of the Board's order, and the Board seeks cross-enforcement of its order. The Union has intervened in support of the Board's decision.

9

II.

A.

Menorah first maintains that the Board wrongly asserted jurisdiction over this dispute. We find no error in the Board's exercise of jurisdiction.

Menorah's jurisdictional argument arises from the NLRA's definition of "employers" subject to the Act's mandates. Section 8 of the NLRA enumerates practices that an "employer" may not perform. 29 U.S.C. § 158(a). The Act defines the term "employer" to exclude "any State or political subdivision thereof." *Id.* § 152(2). The Supreme Court has upheld the Board's construction of the term "political subdivision" under that provision to mean an entity "(1) created directly by the state, so as to constitute [a] department[] or administrative arm[] of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." *NLRB v. Nat. Gas Util. Dist. of Hawkins Cty.*, 402 U.S. 600, 604-05 (1971). An entity satisfying either prong of that test falls outside the Board's jurisdiction because it is not a statutory "employer."

Menorah argues that its Nursing Peer Review Committee qualifies as a political subdivision under both prongs of the *Hawkins County* test, and that the hospital therefore does not function as a statutory employer when it acts through the Committee to fulfill obligations imposed by state law. According to Menorah, the Committee's ostensible status as a non-employer should be imputed to Menorah with regard to all of the alleged unfair labor practices in this case.

As an initial matter, the Board exercised jurisdiction over Menorah itself, not its Nursing Peer Review Committee.

Menorah was the sole respondent in the proceedings before the agency, and, as the "aggrieved party," 29 U.S.C. § 160(f), is the only petitioner here. There is no dispute that Menorah itself qualifies as a statutory employer capable of committing unfair labor practices in violation of the NLRA. And both the ALJ and the Board attributed the charged NLRA violations to Menorah.

To the extent the status of the Committee (as opposed to Menorah itself) as a statutory employer nonetheless bears on the Board's exercise of jurisdiction over the hospital, the Board reasonably concluded that the Committee is not a "political subdivision" of Kansas. The ALJ rejected Menorah's jurisdictional objection, explaining that, "[s]imply because medical providers' peer review committees must conform to state requirements does not make them a political subdivision that is exempt from the Act." ALJ Decision, D.A. 391-92. The Board reasonably adopted the ALJ's conclusion in that respect.

With respect to *Hawkins County*'s first prong, the Committee was not "created directly by the state, so as to constitute [a] department[] or administrative arm[] of the government." *Hawkins Cty.*, 402 U.S. at 604. It is true that Kansas law envisions the existence of peer-review committees within each medical facility in the state. *See, e.g.*, Kan. Stat. Ann. § 65-4929. But the Kansas statute makes each hospital responsible for "establish[ing] and maintain[ing]" its own system of risk management, subject to the requirements of state law. *Id.* § 65-4922(a). The very statutory scheme that requires the existence of peer-review committees thus specifies that they are created and administered by hospitals, not the state. Another state statute reinforces that understanding, permitting a documentary privilege to be "claimed by the legal entity creating the peer

review committee." *Id.* § 65-4915(b). A hospital—not the state—is entitled to claim that privilege as the "entity creating the peer review committee." *See Adams v. St. Francis Reg'l Med. Ctr.*, 264 Kan. 144, 158 (1998).

Moreover, we hesitate to conclude that a committee whose members are "supervised, compensated, hired, appointed, and evaluated by [Menorah] without input from the state," ALJ Decision, D.A. 391, nonetheless functions as a department or administrative arm of the state. It is true that committee members are deemed "state officers engaged in a discretionary function" with regard to their participation in the committee proceedings. Kan. Stat. Ann. § 65-4929(b). But that is for the purpose of according them the "immunity of the state . . . , including [immunity] from the federal and state antitrust laws." *Id*. The members' state-conferred immunity for those purposes does not transform a hospital's peer-review committee into a state agency or department. Indeed, the same provision specifies that committee members are not subject to "any other law relating to or regulating state agencies, officers or employees." *Id.* § 65-4929(c).

Menorah cites no Board or judicial decision holding that an entity established and maintained by a private company pursuant to state law qualifies as a political subdivision of the state. That is not surprising, given that the exemption exists to prevent the Board from interfering with "the employment relationships between state and local governments . . . and their employees." *NLRB v. Princeton Mem'l Hosp.*, 939 F.2d 174, 178 (4th Cir. 1991). Menorah's Nursing Peer Review Committee thus differs from entities previously held to be political subdivisions. To take the example on which Menorah chiefly relies, the State Bar of New Mexico was established by the New Mexico Supreme Court—unquestionably a state actor—and serves as "an

administrative arm of the judicial branch of government." *State Bar of New Mexico*, 346 N.L.R.B. 674, 676 (2006). The same cannot be said of Menorah's own Nursing Peer Review Committee.

With regard to the second prong of the *Hawkins County* test, the Committee is not "administered by individuals who are responsible to public officials or to the general electorate." 402 U.S. at 604-05. As the Board has explained, the pertinent question is "whether a majority of the individuals who administer the entity . . . are appointed by and subject to removal by public officials." *Pilsen Wellness Ctr.*, 359 N.L.R.B. 626, 628 (2013). Menorah cites no evidence that Committee members are either appointed or removable by public officials (as opposed to by Menorah's own personnel). For those reasons, the Board reasonably concluded that Menorah's Nursing Peer Review Committee does not qualify as a political subdivision of Kansas under either prong of the *Hawkins County* test.

B.

On the merits of the Board's findings of unfair labor practices, we first consider whether Menorah violated the NLRA by denying the nurses' requests for union representation in connection with their peer-review hearings before the Committee. In *NLRB v. J. Weingarten, Inc.*, the Supreme Court sustained the Board's understanding that the NLRA "creates a statutory right in an employee to refuse to submit without union representation to an interview which he reasonably fears may result in his discipline." 420 U.S. at 256. Here, neither Centye nor Smith was permitted to bring a union representative when appearing before the Committee. The Board held that Menorah thereby violated the nurses' *Weingarten* right. The Board's ruling cannot be sustained.

*Weingarten* affirmed the Board's conclusion that it would be a "serious violation of the employee's individual right to engage in concerted activity by seeking the assistance of his statutory representative if the employer denies the employee's request and *compels* the employee to appear unassisted at an interview which may put his job security in jeopardy." *Id.* at 257 (emphasis added) (internal quotation marks omitted). An employee's *Weingarten* right is infringed, that is, when an employer *compels* him to appear at such an interview but denies him union representation. Conversely, absent compulsory attendance, the right to union representation recognized in *Weingarten* does not arise: the Court expressly grounded its decision on an understanding that an "employer is free to carry on his inquiry without interviewing the employee, and thus leave to the employee the choice between having an interview unaccompanied by his representative, or having no interview." *Id.* at 258.

Here, Centye and Smith were given precisely that choice. The letters advising them of the charges against them expressly "afforded an *opportunity*" to appear before the Committee "*if you choose*." D.A. 71, 73 (emphases added). Moreover, they were invited to "submit a written response . . . if you wish in lieu of an appearance." *Id.* In those circumstances, neither nurse was compelled to attend a Committee hearing so as to trigger a right to union representation under *Weingarten*.

None of this is to deny that Centye and Smith might well have felt it would be decidedly in their interests to participate in a Committee hearing. After all, the letters they received contained no information about the underlying factual allegations against them. They understandably could have regarded the hearing as affording them a singular opportunity to learn about—and potentially dispel—the allegations about

their ostensible misconduct. That would have been especially true for Centye: her letter stated that "the Committee cannot fairly and accurately make a final decision without more details that can only be provided by you." *Id.* at 71. So we accept that both nurses could have believed that attending the hearings would inure substantially to their benefit.

Even so, the Supreme Court in *Weingarten* explicitly contemplated—and accepted—that an employee might have a strong incentive to attend a hearing for those sorts of reasons. In explaining that an employer retained the "prerogative[]" to give an employee a "choice" between attending an interview without a union representative and "having no interview" at all, the Court understood that a person who elected to have no interview would "forgo[] any benefits that might be derived from one." 420 U.S. at 258. Put another way, by "refrain[ing] from participating in the interview," an employee would "protect[] his right to representation, but at the same time relinquish[] any benefit which might be derived from the interview." *Id.* at 259 (internal quotation marks omitted). In that event, the employer would "be free to act on the basis of whatever information he had and without such additional facts as might have been gleaned through the interview." *Id.* (internal quotation marks omitted).

Here, Centye and Smith, having been given the option to forgo attendance at the Committee hearing, presumably weighed the benefits and drawbacks of doing so and elected to participate. The Board nonetheless concluded that their *Weingarten* right had been infringed. The Board reasoned that, when Menorah denied the nurses' request for union representation at the hearing, "it was obligated, at that point, to give the employees the opportunity to cease their participation in the meetings," *Midwest Div.-MMC, LLC d/b/a Menorah Med. Ctr.*, 362 N.L.R.B. No. 193, 2015 WL

5113235, at *3 (2015)—even though they had already been told in their letters that their participation was optional (and also that they could instead submit information in writing). *Weingarten*, however, contains no suggestion that the NLRA requires an employer to *renew* advice to an employee that her attendance at a hearing is optional. And the Board cited no judicial or agency precedent establishing such a requirement.

Rather, the decisions on which the Board relies involved circumstances in which the employer compelled the employee's attendance in a proceeding. *E.g.*, *U.S. Postal Serv.*, 241 N.L.R.B. 141 (1979). In that situation, if an employee requests union representation, the Board's decisions require the employer to discontinue the interview unless (i) "the employee voluntarily agrees to remain unrepresented *after* having been presented by the employer with the choice[]" to "continu[e] the interview unaccompanied by a union representative or hav[e] no interview at all," or (ii) "the employee is otherwise aware of those choices." *Id.* at 141. Here, the nurses, from the outset, were "otherwise aware" that they could choose to forgo attending a hearing. *Id.* The Board does not contend otherwise. In those circumstances, there was no violation of the nurses' *Weingarten* right.

That conclusion is unaffected by our decision in *American Federation of Government Employees, Local 1941 v. Federal Labor Relations Authority*, 837 F.2d 495, 499 (D.C. Cir. 1988). That case involved a provision of the Federal Service Labor-Management Relations Statute that grants union representation to federal employees in connection with investigations that can result in disciplinary action. 5 U.S.C. § 7114(a)(2)(B). We noted that the provision aimed "to make the *Weingarten* right applicable to federal employees" but that "Congress anticipated that the statutory right to representation in examinations may evolve

differently in the federal sector." 837 F.2d at 499 (internal quotation marks omitted). We construed the provision to extend a right to union representation even if a federal employee is not compelled to attend an investigatory interview. But in doing so, we observed that "Congress sought to appropriate the general principles of *Weingarten* and allow those principles to evolve in the unique and varying circumstances of federal employment, not to hold those principles to the factual and procedural context of *Weingarten*." *Id.* at 500.

This case does not involve "the unique and varying circumstances of federal employment" addressed in the FSLMRS. Rather, it involves the NLRA. And the NLRA, under the interpretation affirmed by the Supreme Court in *Weingarten*, does not recognize a right to union representation when an employee has a choice to forgo participating in an investigatory hearing but elects to attend in any event.

C.

Menorah next challenges the Board's ruling that it violated the NLRA by failing to furnish information requested by the Union about the peer-review program. The Board concluded that the withheld information is relevant to the Union's mission and that Menorah's asserted confidentiality interests do not outweigh the Union's need for the materials. We see no basis to set aside the Board's conclusion.

An employer's statutory obligation to engage in collective bargaining "includes a duty to provide relevant information needed by a labor union for the proper performance of its duties as the employees' bargaining representative." *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303 (1979). The relevance of the requested information for

that purpose is measured under a "liberal, discovery-type" standard. *DaimlerChrysler Corp. v. NLRB*, 288 F.3d 434, 440 (D.C. Cir. 2002). When a union demonstrates the relevance of the information it seeks, the Board "balance[s] a union's need for the information against any legitimate and substantial confidentiality interests established by the employer." *Pa. Power Co.*, 301 N.L.R.B. 1104, 1105 (1991) (internal quotation marks omitted). The employer must furnish the requested information if "the union's need for the information outweigh[s] the general policy regarding confidentiality." *Kaleida Health, Inc.*, 356 N.L.R.B. 1373, 1379 (2011). State-law privileges present a valid basis for claiming confidentiality. *Id.* at 1378.

Here, after Centye and Smith received the letters apprising them of the allegation that they had engaged in unprofessional conduct, a representative of the Union, Sheilah Garland, requested information from Menorah about the operation of its Nursing Peer Review Committee. Garland's requests on behalf of the Union fell into three categories. First, she sought information describing the Committee, including the Committee's structure, purpose, and functions, along with the names of committee members and those present for the hearings. Second, she requested information about allegations investigated by the Committee, including the names of nurses notified that they were under investigation, the nature of the allegations against them, and copies of investigatory information used by the hospital. Third, she sought disciplinary documents issued by the Committee.

The Board deemed all of the requested information to be relevant to the Union's enforcement of the collective-bargaining agreement, explaining that "the Committee's work can lead to [Menorah's] suspension or discharge of an

employee." *Menorah*, 2015 WL 5113235, at *7. The Board further found any countervailing confidentiality interests to be modest, given that the requested information "did not trench on the Committee's internal deliberative processes." *Id.* at *6. The Board thus found that Menorah violated Section 8 of the NLRA by failing to comply with the Union's informational request.

We conclude that substantial evidence supports the Board's determination. *See Wallaesa v. Fed. Aviation Admin.*, 824 F.3d 1071, 1084 (D.C. Cir. 2016). As an initial matter, we perceive no basis for rejecting the Board's conclusion that the requested information about the peer-review program and investigations is relevant to the Union's ability to enforce the collective-bargaining agreement. The agreement enables Menorah to "suspend, discharge or otherwise discipline bargaining unit members for just cause." D.A. 115. In that regard, Menorah's Risk Management Plan articulates two pertinent expectations concerning "[u]se of [r]isk [m]anagement [d]ata." *Id.* at 68. First, "[w]hen the investigation of a reported incident [i.e., by the Peer Review Committee] results in an adverse finding, the event will be considered at the time of . . . employee performance evaluations." *Id.* Second, "[i]nternal institutional actions may be taken as the result of investigation." *Id.*

Those disciplinary objectives are reinforced by Kansas law, which provides that a peer-review committee may "report to and discuss its activities, information and findings" with a hospital's "administrative officer" without waiving the statutory privilege concerning peer-review proceedings. Kan. Stat. Ann. § 65-4915(e). The Risk Management Plan also envisions a linkage between the Nursing Peer Review Committee and Menorah's evaluation of its employees' performance: one of the Plan's stated objectives is to

"[e]stablish communication between risk management, peer review, . . . and performance improvement functions in the Hospital." D.A. 54.

With regard to Menorah's confidentiality interests in the information requested by the Union, Menorah describes its interests solely by reference to the state-law provision privileging "the reports, statements, memoranda, proceedings, findings and other records submitted to or generated by peer review committees." Kan. Stat. Ann. § 65-4915(b). The Kansas Supreme Court, however, has not construed that privilege to encompass any document that may incidentally come into committees' possession. *See Adams*, 264 Kan. at 171. Rather, the privilege attaches to documents created to satisfy the peer-review requirements of state law, including eventual consideration by the applicable peer-review committee. *See id.* at 165 (holding that the privilege covered hospital disciplinary forms found to be "part of the peer review process as envisioned by the legislature").

The Board reasonably determined that, for all three categories of information sought by the Union, the Union's interests in the information prevail over Menorah's confidentiality interests. As to the first category—information pertaining to the Committee's structure, functions, and membership—Menorah did provide the Union a copy of its Risk Management Plan, which broadly outlines the Committee's purpose and scope, as well as the Kansas statutes outlining the Committee's functions. But Menorah did not furnish any other information within the scope of the request, and the Risk Management Plan does not comment on the Committee's membership or the identities of members who attended the relevant meetings. As long as the Plan continues to enable the Committee to function as an adjunct to the hospital's internal disciplinary process, the Union will

retain an interest in obtaining information about the Committee's structure, functions, and makeup. And as the Board concluded, that information would seem generally to fall outside—or at least outside the core of—the statutory privilege.

As to the second category of requested information—that related to allegations investigated by the Committee—the information could have substantial relevance to the Union's representation of affected employees. The Board found "nothing in the record to suggest that this information was prepared exclusively for use by the Committee outside of the Hospital's regular course of business." *Menorah*, 2015 WL 5113235, at *5 n.15. Menorah did not challenge that finding in its briefs, so it has given us little reason to question the Board's conclusion that the Union's interests in obtaining the information outweigh Menorah's confidentiality interests as defined by the statutory privilege.

As to the third category—copies of disciplinary records—Menorah, in declining to supply responsive information, observed that "[t]he committee does not offer, impose or suggest discipline to RNs[;] it investigates reportable incidents and provides to the State its findings as per the Kansas Statutes." D.A. 80. But as the Board observed, "the Committee's disciplinary letters state that the employee's conduct has been preliminarily determined to be grounds for disciplinary action," and "the Committee's work can lead to [Menorah's] suspension or discharge of an employee." *Menorah*, 2015 WL 5113235, at *7. The requested information, moreover, would enable the Union "to compare incidents that cause nurses to become targets of investigations that can result in the revocation of a license and ultimately termination from employment," and "to properly determine whether to file a grievance on behalf of those who

have been targeted for investigation by the Committee." *Id.* While the disciplinary records may implicate the state law privilege, we find no basis to overturn the Board's reasonable conclusion that the Union's significant interests in obtaining the information outweigh Menorah's confidentiality concerns.

D.

Menorah's Risk Management Plan includes a Confidentiality Rule prohibiting employees from "disclos[ing] information concerning reportable incidents except to their superiors" and certain other parties without prior approval from the "Risk Manager, Administration, or legal counsel." D.A. 69. The Board invalidated that provision as an excessive restriction on employees' Section 7 rights. We sustain the Board's ruling and conclude that it is supported by substantial evidence.

Sections 7 and 8 of the NLRA protect an employee's "right to discuss the terms and conditions of her employment with other employees." *Cintas Corp. v. NLRB*, 482 F.3d 463, 466 (D.C. Cir. 2007). An employer presumptively violates the Act "when it maintains a work rule that . . . tends to chill employees in the exercise of their Section 7 rights." *Martin Luther*, 343 N.L.R.B. at 646. That situation occurs when "employees would reasonably construe the language [of a work rule] to prohibit Section 7 activity." *Id.* at 647. We construe any ambiguity in such a rule against the employer. *Banner Health Sys. v. NLRB*, 851 F.3d 35, 40 (D.C. Cir. 2017) (citing *Cintas Corp.*, 482 F.3d at 468 n.2).

Maintaining a rule reasonably likely to chill employees' Section 7 activity amounts to an unfair labor practice unless the employer "present[s] a legitimate and substantial business justification for the rule" that "outweigh[s] the adverse effect

on the interests of employees." *Hyundai Am. Shipping Agency, Inc. v. NLRB*, 805 F.3d 309, 314 (D.C. Cir. 2015). Here, the Confidentiality Rule, subject to certain exceptions, bars employees from disclosing "information concerning reportable incidents." Menorah contends that employees would read the provision to refer solely to information submitted to (or generated by) the Committee, such that the Rule's reach would be coextensive with the scope of the Kansas statutory privilege earlier described, Kan. Stat. Ann. § 65-4915(b). But the Board found that "employees would reasonably understand the . . . prohibition on disclosure of 'reportable incidents'" to reach considerably more broadly, so as to encompass "discussions about the *events* underlying the peer review investigations." *Menorah*, 2015 WL 5113235, at *1 n.3 (emphasis added). That is, the Rule would bar employees from discussing the underlying facts of incidents investigated by the Committee. So understood, the Rule would plainly chill the exercise of Section 7 rights.

The Board's interpretation of the Rule is reasonable. Menorah's Risk Management Plan defines "reportable incident" as "an act or practice by a 'health care provider'" that must be reported to the applicable licensing agency—here, the Nursing Board. D.A. 55. And a prohibition on disclosing information "concerning reportable incidents" could readily be understood to encompass any discussions about the underlying "act or practice." Menorah does not suggest any legitimate and substantial justification for curtailing discussion of incidents that give rise to peer-review proceedings. Those events may also give rise to internal disciplinary processes, which of course can be the subject of grievances under the collective-bargaining agreement. *See Banner Health*, 851 F.3d at 41 (explaining that restrictions on employees' communications cannot sweep "so broadly as to include working conditions") (quoting *Double Eagle Hotel &*

*Casino v. NLRB*, 414 F.3d 1249, 1260 (10th Cir. 2005)). We therefore affirm the Board's conclusion that the present Confidentiality Rule is unduly broad in violation of employees' Section 7 rights.

E.

Finally, Menorah challenges the Board's affirmance of the ALJ's decision to admit testimony about the Committee's proceedings and to revoke a protective order initially covering that testimony. Specifically, in the hearing before the ALJ, participants in the peer-review process testified about what they and others had said during the peer-review committee proceedings. We review the ALJ's admission of that testimony for abuse of discretion, *Veritas Health Servs., Inc. v. NLRB*, 671 F.3d 1267, 1273 (D.C. Cir. 2012), and we find no abuse here.

The Board explained that the testimony was "critical" to understanding and resolving the alleged unfair labor practices, including, in particular, the charge that Menorah had "violated Sec. 8(a)(1) by denying employees their right to a union representative during their appearance before the Committee." *Menorah*, 2015 WL 5113235, at *1 n.2. Although we have concluded, as explained, that the employees ultimately had no *Weingarten* right to union representation, their testimony about their interactions with the Committee could be highly germane to understanding the factual context surrounding the resolution of the *Weingarten* charge. The ALJ reasonably admitted the testimony to enable an informed consideration of the issue.

Menorah, citing the Kansas statutory privilege, contends that the testimony about the proceedings before the Committee should not have been admitted (or should have

remained subject to a protective order). A state-law privilege is not necessarily binding in a federal proceeding. *See* Fed. R. Evid. 501. At any rate, the Kansas statutory privilege—assuming its applicability to the testimony at issue here—is not absolute even as a matter of state law. *See Adams*, 264 Kan. at 166, 171-74. Rather, a court must consider "the interest of the party in obtaining the information," such that "the substantive interest in preserving the confidentiality of the information" may "give way to assure all the facts will be available for a fair determination of the issues." *Id.* at 171-72 (citation omitted).

Here, in light of the significant federal interest in enabling an informed resolution of the unfair-labor-practice charges, we cannot conclude that the ALJ abused her discretion in admitting the testimony by the participants in the Committee's proceedings.

\* \* \* \* \*

For the foregoing reasons, we grant in part Menorah's petition for review and enforce the Board's order in all other respects.

*So ordered.*

KAVANAUGH, *Circuit Judge*, concurring in part and dissenting in part:  I join all except Part II.C of the majority opinion.  I write separately to elaborate on the *Weingarten* issue addressed in Part II.B and to disagree on the information-request issue addressed in Part II.C.

*First*, the Board concluded that the hospital violated the *Weingarten* rights of nurses Centye and Smith.  (Under *Weingarten*, union members have a right to be accompanied by a union representative during certain investigative interviews conducted by employers.  *See NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 256 (1975).)  The majority opinion rejects the Board's conclusion.  I agree with the majority opinion.  In rejecting the Board's conclusion, however, the majority opinion does not address the threshold question of whether *Weingarten* rights apply in the first place in peer review committee interviews.  Instead, the majority opinion concludes that, even assuming arguendo that *Weingarten* rights apply, *Weingarten* was not violated in this case.  The majority opinion's silence on the threshold question of course should not be interpreted as an implicit conclusion that *Weingarten* rights apply in peer review committee interviews.  *See, e.g.*, BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 84 (2016); *United States v. Shabani*, 513 U.S. 10, 16 (1994).  Rather, that threshold question remains open in this Circuit for a future panel to address and decide.

If we were to reach the threshold question, I would hold that *Weingarten* rights do *not* apply in peer review committee interviews.  *Weingarten* rights apply primarily in the disciplinary context when an employer conducts an investigative interview of the employee.  Those rights help "redress the perceived imbalance of economic power between labor and management." *Weingarten*, 420 U.S. at 262.  When an interview is not part of the employer's disciplinary process but is instead, for example, part of a state licensing process mandated by statute, *Weingarten* rights do not apply.  *Cf. Mt.*

*Vernon Tanker Co. v. NLRB*, 549 F.2d 571, 575 (9th Cir. 1977). Because the peer review committee at issue here is not part of the hospital's disciplinary process and is instead part of the state licensing process, employees do not have *Weingarten* rights in interviews conducted by the peer review committee.

*Second*, the Board concluded that the hospital violated the National Labor Relations Act when the hospital did not comply with the Union's requests for information about the inner workings of the peer review committee. The majority opinion sustains the Board's decision. Even taking into account our deferential standard of review, I cannot uphold the Board's decision on this issue. I instead would rule in accord with Member Johnson's dissent from the Board's decision.

To assess a union's information request, the Board balances the employer's confidentiality interest in the information against the union's need for the information. *See* Howard Industries, Inc., 360 NLRB No. 111, at 2 (2014).

Here, as exemplified by Kansas's peer review statute, the hospital possesses a strong interest in protecting the confidentiality of the peer review process. Kan. Stat. Ann. § 65-4915(b). Maintaining confidentiality helps ensure the frank participation of medical professionals in peer review committee deliberations. As the American Hospital Association explains: "Without strict confidentiality, peer review's effectiveness would collapse." American Hospital Association Br. 11. Confidentiality is therefore essential to an effective peer review process, and the peer review process in turn is critical to improving the quality and safety of health care. For that reason, almost every State – including Kansas – has rules protecting the confidentiality of peer review proceedings.

3

While the hospital's confidentiality interest in the requested information is weighty, the Union's need for that information is minimal at best. That is because the peer review committee does not itself threaten "direct adverse employment action" against the Union's members. Midwest Division – MMC, LLC, 362 NLRB No. 193, at 10 (2015) (Johnson, dissenting). As Member Johnson explained, peer review committees are instead "part of the State's regulatory apparatus for overseeing its licensed healthcare professionals and the overall adequacy of healthcare in the State of Kansas. . . . Because the committees do not represent the [hospital] and because their findings are submitted to the State as part of the regulatory scheme, the Union's interest in information about the committee's internal deliberations is limited. Peer review does not directly implicate the [hospital's] disciplinary process nor either party's obligations under the collective-bargaining agreement." *Id.*

After considering the hospital's confidentiality interest and the Union's need for the information, the Board here should have rejected most of the Union's information request, as Member Johnson explained in his dissent. Instead, the Board granted the Union's request. In doing so, the Board gave very short shrift to the hospital's confidentiality interest in the requested information and significantly exaggerated the Union's need for the information. *See id.* at 7-11. I would vacate the Board's order to the extent it ruled that the Union was entitled to all of the peer review information it requested. I would remand to the Board to properly re-balance the hospital's confidentiality interest against the Union's asserted need for the information, in the manner suggested by Member Johnson.

With those observations, I respectfully concur in part and dissent in part.